NESTLÉ USA, INC.,
Petitioner-Appellant-Petitioner,

v.

WISCONSIN DEPARTMENT OF REVENUE,
Respondent-Respondent.

Supreme Court

*No. 2008AP322. Oral argument September 7, 2010.*
*—Decided February 2, 2011.*

2011 WI 4

(Also reported in 795 N.W.2d 46.)

For the petitioner-appellant-petitioner there was a brief by *Robert L. Gordon* and *Michael Best & Friedrich LLP* and oral argument by *Robert L. Gordon*.

For the respondent-respondent there was a brief by *F. Thomas Creeron III,* assistant attorney general with whom on the brief was *J.B. Van Hollen,* attorney general, and oral argument by *F. Thomas Creeron III.*

An amicus brief was filed by *Robert Horowitz* and *Stafford Rosenbaum LLP* and *Stephen C. Nick* and *City of Eau Claire* and oral argument by *Robert Horowitz.*

An amicus brief was filed by *James Buchen* and *R.J. Pirlot* for *Wisconsin Manufacturers and Commerce, Inc.*

¶ 1. MICHAEL J. GABLEMAN, J. This is a review of a published decision of the court of appeals affirming the circuit court's judgment to uphold the determination of the Tax Appeals Commission.[1] In late 2001, Nestlé finished constructing a plant (the "Gateway Plant") in Eau Claire, Wisconsin. Nestlé designed the Gateway Plant to meet rigorous United States Food and

---

[1] *Nestlé USA, Inc. v. Wis. Dep't of Revenue,* 2009 WI App 159, 322 Wis. 2d 156, 776 N.W.2d 589; *Nestlé USA, Inc. v. Wis. Dep't of Revenue,* Docket Nos. 04–M-101, 05–M-21, Wis. Tax Rptr. (CCH) ¶ 400–952 *34,130 (WTAC Nov. 29, 2006).

Drug Administration ("FDA") standards for the processing of powdered infant formula.

¶ 2. After its completion, the Department of Revenue ("DOR") sent Mr. Curt Stepanek to assess the Gateway Plant for property tax purposes. In order to assess the property, Stepanek had to complete two preliminary steps: 1) determine the "highest and best use" of the facility and 2) select and apply the appropriate assessment method to be used in determining its value.

¶ 3. Stepanek made the following observations while considering the Gateway Plant's "highest and best use": the plant had a number of expensive features which made it specially suited to produce powdered infant formula; Nestlé's greatest net return would come from the plant's continued use as a powdered infant formula production facility; and a likely purchaser of the Gateway Plant would be one of Nestlé's competitors in the powdered infant formula industry. Based upon these observations, Stepanek concluded that the Gateway Plant's "highest and best use" was as a powdered infant formula production facility.

¶ 4. Stepanek then considered which of two assessment methods to use in determining the Gateway Plant's value: the comparable sales approach or the cost approach. He first attempted to assess the Gateway Plant under the comparable sales approach. This approach uses market sales of properties that are reasonably comparable to the subject property's "highest and best use" to predict the probable market price of the subject property. Stepanek could not find any powdered infant formula production facility in the United States that had been sold for continued use as a powdered infant formula production facility. Because there were no comparable sales, Stepanek decided he could not use the comparable sales assessment method.

¶ 5. Accordingly, Stepanek assessed the Gateway Plant based on the cost assessment method. This method considers the cost of building an exact replica of the structure to be assessed, less depreciation and tax-exempt components.[2] Under the cost assessment method, the assessor deducts depreciation for functional obsolescence from the replication cost. This deduction occurs when a property contains an unmarketable feature called a "super adequacy."[3] Stepanek decided that all of the Gateway Plant's specialized features could be marketed and sold for use in a powdered infant formula production facility. Because of this, Stepanek concluded that the specialized features were not super adequate. Thus, Stepanek denied any deduction for functional obsolescence and assessed the property at $10,915,000.[4]

---

[2] Reproduction cost represents the cost of an exact replica of the structure using the same materials, design, and quality of workmanship. Bureau of Assessment Practices, Wis. Dep't of Revenue, Wisconsin Property Assessment Manual, 7–21 (2005) (hereinafter "*Property Assessment Manual*"). Stepanek used Nestlé's actual construction costs of $13,168,780 for the Gateway Plant as the baseline value of the improvements. He then subtracted 3% for depreciation and 25% for tax-exempt components. In total, Stepanek valued the Gateway Plant property improvements at $9,579,900.

[3] A property is super adequate when a prudent purchaser or owner would not include or pay for the "greater capacity or quality in the particular type of structure under current market conditions." *Property Assessment Manual,* at G-40. In other words, if a reasonable person shopping for a generic food processing plant would not place any value in the Gateway Plant's features that were specially designed for powdered infant formula production facilities, then those special features would be "super adequate."

[4] Stepanek's initial assessment included $1,335,100 for the land value. The Tax Appeals Commission reduced the land's

¶ 6. Nestlé disagreed with Stepanek's assessment and hired Mr. S. Steven Vitale to appraise the property. Similar to the DOR's assessor, Vitale could find no example of a powdered infant formula production facility ever being sold for continued use as a powdered infant formula production facility. Because of this lack of sales data, Vitale decided the Gateway Plant's "highest and best use" was not as a powdered infant formula production facility, but rather as a food processing plant. Vitale then appraised the Gateway Plant by using the comparable sales approach. He used sales of food processing plants which he believed were comparable to the Gateway Plant—not powdered infant formula production facilities. Applying the comparable sales approach, Vitale appraised the Gateway Plant at $3,590,000.

¶ 7. Vitale also made an alternative appraisal under the cost method. He concluded that it would cost Nestlé $17,196,879 to reproduce an identical plant. He then deducted $13,895,020 for functional obsolescence. Vitale included such a large functional obsolescence deduction because many of the Gateway Plant's FDA-required features had no value in the market for generic food processing plants. After other deductions, Vitale's cost method appraisal totaled $3,430,000.

¶ 8. The determinative issue is whether Nestlé presented sufficient contrary evidence to overcome the presumption of correctness that the Gateway Plant's "highest and best use" was as a powdered infant formula production facility. The DOR argues the Gateway Plant's "highest and best use" was as a powdered infant formula production facility. The DOR could find no comparable

appraised value to $1,140,000. The DOR did not appeal this reduction. Thus, the Tax Appeals Commission determined the total assessed value of the property to be $10,719,900, which is the amount we affirm.

sales of powdered infant formula production facilities that satisfied FDA regulations and instead based its valuation on a cost assessment method. Nestlé argues the Gateway Plant's "highest and best use" was as a food processing plant. Nestlé did find comparable food processing plant sales and argues it properly used them in its comparable sales method appraisal.

¶ 9. We conclude that Nestlé did not advance sufficient evidence to overcome the presumption of correctness afforded to the DOR's assessment. Nestlé failed to introduce significant evidence that no market existed for the Gateway Plant's sale as a powdered infant formula production facility. Also, we conclude that the Tax Appeals Commission's acceptance of the DOR's determination that the Gateway Plant's "highest and best use" was as a powdered infant formula production facility is supported by substantial evidence. Therefore, we hold that the DOR properly used the cost method and appropriately denied Nestlé a deduction for functional obsolescence. Accordingly, we affirm the decision of the court of appeals.

## I. BACKGROUND

¶ 10. Nestlé built the Gateway Plant in 2001 as a satellite facility to its main plant, both of which are located in Eau Claire, Wisconsin. The Gateway Plant is a special purpose facility designed to produce whole protein powdered infant formula, and was specifically designed to meet FDA regulations in this field. The specialized features of the plant include: a large spray dryer housed in a 122–foot-high spray-dry tower, ultra-sensitive processing areas with specially treated anti-microbial surfaces, reverse osmosis water treatment equipment designed to remove impurities from the city water, a waste-water treatment facility which lowers

the pH of the waste before discharge, and a fire pump house necessitated by the height of the spray dryer. These features added significant costs to the Gateway Plant's construction.

## A. The DOR's Assessment of the Gateway Plant

¶ 11. In 2005, the Department of Revenue assigned Mr. Curt Stepanek ("Stepanek") to assess the Gateway Plant for property tax purposes. In order to assess it, Stepanek had to do two preliminary steps: 1) determine the "highest and best use" of the facility and 2) select and apply the appropriate assessment method to be used in determining its value. He made three significant conclusions in determining the Gateway Plant's "highest and best use." First, he concluded that the plant had a number of expensive features which made it specially suited to produce powdered infant formula. Second, Stepanek concluded that Nestlé's greatest net return would come from continuing to use the Gateway Plant as a powdered infant formula production facility. Third, he concluded that a likely purchaser of the Gateway Plant would be one of Nestlé's competitors in the powdered infant formula industry.[5] Based upon these conclusions, Stepanek decided that the Gateway Plant's "highest and best use" was as a powdered infant formula production facility.

¶ 12. Next, Stepanek needed to determine the appropriate assessment method to use. He considered two methods: the comparable sales approach and the cost approach. The comparable sales approach uses market sales of reasonably comparable properties to

---

[5] Stepanek testified that at the time he thought Mead Johnson, Abbott Laboratories, or Wyeth would be likely purchasers of the plant if offered for sale.

predict the probable market price of the subject property. Here, however, Stepanek could find no sales of comparable powdered infant formula production facilities in the United States. After examining sales of other, less-specialized food processing plants, Stepanek eventually rejected the comparable sales approach. He concluded that those plants were not reasonably comparable to the Gateway Plant because they lacked the FDA-required features built into the Gateway Plant.

¶ 13. Stepanek then used the cost approach instead of the comparable sales approach. The cost approach values improvements (such as newly constructed commercial buildings) by estimating the reproduction cost of the structure. Deductions for depreciation, functional obsolescence, and tax-exempt components are then subtracted from that estimated cost to reach a final value.

¶ 14. Stepanek valued the reproduction cost of the improvements at $13,168,780. He then added the value of the land, and subtracted for physical depreciation and exempt manufacturing components to reach a total value of $10,915,000. Because the plant was new and operated specifically for its purpose of manufacturing powdered infant formula, Stepanek did not reduce the 2003 or 2004 assessments for any functional obsolescence.

B. Nestlé's Competing Appraisal

¶ 15. Nestlé submitted its own appraisal, which was performed by its retained expert, Mr. S. Steven Vitale ("Vitale"). Similar to the DOR's expert, Vitale first considered performing an appraisal under the comparable sales method. Vitale concluded that because powdered infant formula manufacturers operate in a limited

market, the Gateway Plant would be unlikely to sell for its continued use as a powdered infant formula production facility. After considering a number of alternative uses for the facility, Vitale classified the Gateway Plant's "highest and best use" as an unspecified food processing plant and not as a powdered infant formula production facility. Vitale then compared the Gateway Plant to sales of six food processing plants which had recently been sold and which he believed were comparable to the Gateway Plant.[6] Based upon his belief that the six facilities were reasonably comparable to the Gateway Plant, Vitale valued the Gateway Plant at $3,590,000.

¶ 16. Vitale also made an alternative assessment under the cost approach. He valued the reproduction cost of the improvements at $17,196,879, and, among other deductions, subtracted $13,895,020 for functional obsolescence because he believed that the FDA-required features built into the Gateway Plant were "super adequate" for the uses of a generic food processing plant. Vitale's cost-based assessment totaled $3,430,000.

### C. Nestlé Challenges DOR's Appraisal

¶ 17. Nestlé filed a timely objection to the 2003 and 2004 assessments with the State Board of Assessors in each respective year and, as required by statute, paid its tax on the amount of the original assessment when

---

[6] Vitale did not specify which type of food processing plant would serve as the Gateway Plant's "highest and best use." He instead listed a number of potential uses, such as a pork processing plant, a cheese processing plant, a distribution/ warehouse facility, a dry blend dairy manufacturing plant, a cheese manufacturing facility, and a butter manufacturing facility.

the deadline arrived.[7] The Board of Assessors denied each objection and Nestlé petitioned the Tax Appeals Commission for review.[8]

¶ 18. The Tax Appeals Commission consolidated both petitions and agreed with the DOR's assessment for both years. It concluded that "the nonexistence of recent sales of specialized manufacturing plants does not mean that there is no market for such plants." *Nestlé*, Wis. Tax. Rptr. (CCH) ¶ 400–952 at *34,136. Agreeing with the DOR, the Commission stated that "the presumption of correctness associated with the [DOR's] assessment of the improvements to the Gateway Plant has not been rebutted and there is credible evidence to support the assessment."[9] The Commission concluded that the DOR correctly used the cost method and correctly denied Nestlé a deduction for functional obsolescence.

¶ 19. Nestlé then sought *certiorari* review in the Dane County Circuit Court. The circuit court, the Honorable C. William Foust presiding, found that Nestlé "failed to produce any evidence that the properties used in its comparable analysis were in fact comparable." *Nestlé USA, Inc. v. Wis. Dep't of Revenue,* at 7, No. 06CV4401 (Dane Cty. Cir. Ct. Nov. 26, 2007). It found that the Tax Appeals Commission made "no finding of fact or conclusion that there is no market for the Gateway facility." *Id.* at 9. The circuit court agreed

---

[7] Wis. Stat. § 70.84 (2003–04). All subsequent references to the Wisconsin Statutes are to the 2003–04 version unless otherwise indicated.

[8] *Nestlé,* Wis. Tax. Rptr. (CCH) ¶ 400–952, at *34, 130.

[9] *Id.* The Tax Appeals Commission held that the presumption of correctness granted to the assessor was rebutted with regard to the value of the land. Neither party appealed this point. *See supra* note 4.

with the DOR that Nestlé failed to present sufficient contrary evidence to overcome the presumption of correctness that the Gateway Plant's "highest and best use" was as a powdered infant formula production facility. Nestlé sought further review from the court of appeals.

¶ 20. The court of appeals unanimously affirmed the circuit court. First, it agreed with the DOR that whether Nestlé could find a buyer for the Gateway Plant for its continued use as a powdered infant formula production facility was in dispute. Second, the court of appeals concluded that the burden of proving the absence of a market for the Gateway Plant's sale fell on Nestlé. Third, it held that—by itself—the fact that powdered infant formula production facilities are rarely bought and sold did not per se mean that no market existed for their sale. The court of appeals concluded, as did the circuit court, that Nestlé failed to present sufficient contrary evidence to overcome the presumption of correctness that the Gateway Plant's "highest and best use" was as a powdered infant formula production facility.

¶ 21. Nestlé then petitioned this court for review, which we granted.

## II. STANDARD OF REVIEW

██ ██

¶ 22. On appeal from the Commission, we review the Commission's decision, not the decision of the circuit court or the court of appeals. *Wis. Dep't of Revenue v. Menasha Corp.*, 2008 WI 88, ¶ 46, 311 Wis. 2d 579, 754 N.W.2d 95; *Racine Harley-Davidson v. State*, 2006 WI 86, ¶ 9 n.4, 292 Wis. 2d 549, 717 N.W.2d 184. Statutory interpretation is a question of law sub-

ject to de novo review, and we are not bound by an administrative agency's decision. *Harnischfeger Corp. v. LIRC,* 196 Wis. 2d 650, 659, 539 N.W.2d 98 (1995). The DOR argues that in tax cases we should defer to the Commission's interpretations under at least a "due weight" deference. *See id.* at 659–60. Nestlé argues that the Commission's construction of an unambiguous statute is entitled to no deference. We do not reach this question because we hold that, even under the stringent no deference standard, we affirm the Commission's interpretation.

¶ 23. We uphold an agency's findings of fact as long as "substantial evidence" supports the findings. *Milwaukee Symphony Orchestra, Inc. v. Wis. Dep't of Revenue,* 2010 WI 33, ¶ 31, 324 Wis. 2d 68, 781 N.W.2d 674. This "substantial evidence" test means that an agency's findings of fact may be set aside only when a reasonable trier of fact could not have reached them from all the evidence before it, including the available inferences from that evidence. *Id.* The DOR's assessment is entitled to a presumption of correctness which may be overcome only if the challenging party presents significant contrary evidence. Wis. Stat. § 70.995(13). *See also* Wis. Stat. § 70.47(8)(i)(The Commission "shall presume that the assessor's valuation is correct. That presumption may be rebutted by a sufficient showing by the objector that the valuation is incorrect.") It is in light of this presumption that we proceed.

## III. DISCUSSION

¶ 24. The question before us is whether the Tax Appeals Commission reasonably concluded that Nestlé failed to present sufficient contrary evidence to rebut

the presumption of correctness given to the DOR's assessment. In Part A, we provide a brief overview of the Wisconsin real estate assessment framework. In Part B, we examine the Commission's determination that the Gateway Plant's highest and best use is as a powdered infant formula production facility, and conclude it was supported by substantial evidence. In Part C, we review the Commission's application of the cost approach in assessing the Gateway Plant, and conclude it was also supported by substantial evidence.

A. Overview of Assessment Framework

¶ 25. We first turn to a general overview of the real estate assessment framework established by the *Wisconsin Property Assessment Manual* (hereinafter *"Property Assessment Manual"*)[10], statutes, and case law.

¶ 26. The law requires that property taxes be levied upon all real property in this state, except property that is exempt from taxation. Wis. Stat. §§ 70.01–70.02. The rules for real property assessment begin with Wis. Stat. § 70.32(1), which mandates that real property be assessed "from actual view or from the best information that the assessor can practicably obtain, at the full value which could ordinarily be obtained therefore at private sale."[11] Wis. Stat. § 70.32. This statute requires adherence to the *Property Assessment Manual,* absent conflicting law. *Walgreen Co. v.*

---

[10] Bureau of Assessment Practices, *Wis. Dep't of Revenue, Wisconsin Property Assessment Manual,* (2005). In the instant case, the parties cite to the *Property Assessment Manual* last revised in December 2004. Therefore, we also rely on the December 2004 version.

[11] Wisconsin Stat. § 70.32(1) provides in full:

Real property shall be valued by the assessor in the manner specified in the Wisconsin property assessment manual provided

*City of Madison,* 2008 WI 80, ¶ 3, 311 Wis. 2d 158, 752 N.W.2d 687. Therefore, we examine the applicable statutes "in conjunction with basic principles of real estate assessment as described by case law, treatises, and the *Property Assessment Manual." Id.,* ¶ 19.

¶ 27. The *Property Assessment Manual* explains that, regardless of the assessment approach utilized by the assessor, all property must be assessed at its "highest and best use." The subject property's highest and best use is "defined as that use which over a period of time produces the greatest net return to the property owner." *Id.* at 7–9. The *Property Assessment Manual* dictates that the contemplated "highest and best use" must be: 1) legal, 2) complementary,[12] and 3) not highly speculative. *Id.* Additionally, our cases hold, and Chapter One of the *Property Assessment Manual* provides, that the property must also be marketable for that use. *Property Assessment Manual,* at 1–1 ("The law requires that the assessor assess all property . . . which has any marketable value"); *State ex. Rel. Markarian v. City of Cudahy,* 45 Wis. 2d 683, 686, 173 N.W.2d 627 (1970)

under s. 73.03(2a) from actual view or from the best information that the assessor can practicably obtain, at the full value which could ordinarily be obtained therefore at private sale. In determining the value, the assessor shall consider recent arm's-length sales of the property to be assessed if according to professionally acceptable appraisal practices those sales conform to recent arm's-length sales of reasonably comparable property; recent arm's-length sales of reasonably comparable property; and all factors that, according to professionally acceptable appraisal practices, affect the value of the property to be assessed.

[12] The *Property Assessment Manual* defines "complementary" as being "in balance with the uses of the property around it." *Property Assessment Manual,* at 7–9. This requirement stems from the principle of conformity, which stands for the proposition that "[t]he value of a property is increased when it conforms to the standards of a neighborhood." *Id.* at 7–11.

("The statutory rule of assessment of real estate is restricted to its sale value in the open market . . . .").

■■

¶ 28. The *Property Assessment Manual* and our case law set forth a three-tiered methodology for assessing real property's full value at private sale. *Markarian,* 45 Wis. 2d at 686; *Property Assessment Manual,* at 7–18 to 7–30. Evidence of a recent arm's-length sale of the subject property is the best evidence of full value. *Adams,* 294 Wis. 2d 441, ¶ 34. If the subject property has not been recently sold, then an assessor must consider sales of reasonably comparable properties. *Id.* Only in situations where there has been no arm's-length sale of the subject property and there are no reasonably comparable sales may an assessor use one of the third-tier assessment methods. *Id.*

■

¶ 29. Under a third-tier assessment approach, an assessor should consider "all the factors collectively which have a bearing on value of the property in order to determine its fair market value." *Markarian,* 45 Wis. 2d at 683. These factors include "cost, depreciation, replacement value, income, industrial conditions, location and occupancy, sales of like property, book value, amount of insurance carried, value asserted in a prospectus and appraisals produced by the owner." *State ex rel. Mitchell Aero, Inc. v. Bd. of Review of City of Milwaukee,* 74 Wis. 2d 268, 278, 246 N.W.2d 521 (1976). The cost assessment approach, which attempts to value the property based on its reproduction or replacement cost, is one of two third-tier analytic methods.[13] *Adams,* 294 Wis. 2d 441, ¶ 35.

[13] The other third-tier assessment method is the income approach. The income approach assesses property based on the

██

¶ 30. In sum, when reviewing a decision of the Commission, these sources—Wis. Stat. § 70.32, the *Property Assessment Manual,* and our case law—together provide the guiding principles of our review.

B. The Commission's Highest and Best Use Determination is Supported by Substantial Evidence

¶ 31. Nestlé argues that the Commission erred by failing to apply the comparable sales approach in assessing the Gateway Plant, contrary to Wis. Stat. § 70.32(1). The comparable sales approach requires an assessor to consider sales of "reasonably comparable" properties. *See* Wis. Stat. § 70.32(1). If there had been any reasonably comparable sales available, but despite such availability the Commission instead relied on a third-tier assessment method, the assessments would be invalid. *Adams,* 294 Wis. 2d 441, ¶ 37; *Markarian,* 45 Wis. 2d at 686, 173 N.W.2d 627; *State ex. rel Keane v. Bd. of Review of City of Milwaukee,* 99 Wis. 2d 584, 590, 299 N.W.2d 638 (Ct. App. 1980).

¶ 32. The first step in determining whether the Commission erred in not using the comparable sales approach is to consider whether the Commission properly concluded the Gateway Plant's highest and best use is as a powdered infant formula production facility. This is a threshold issue because the properties an assessor

---

amount of income it will generate over its useful life. *Property Assessment Manual,* at 7–26. Here, neither party argues the income approach is applicable.

identifies as "reasonably comparable" to the subject property for assessment purposes must be reasonably comparable to the subject property's highest and best use. *Forest Cnty. Potawatomi Cmty. v. Twp. of Lincoln,* 2008 WI App 156, ¶ 10, 314 Wis. 2d 363, 761 N.W.2d 31 (citing *Property Assessment Manual,* at 7–9 to 7–10). Therefore, a property's highest and best use is often a determinative factor in the assessor's decision on which assessment approach to rely on in appraising the subject property.

¶ 33. As explained above, a subject property's highest and best use must be: 1) legal, 2) complementary, 3) not highly speculative, and 4) marketable for that use. *Property Assessment Manual,* at 1–1, 7–9. Both parties in the instant case agree that the Gateway Plant's current use as a powdered infant formula production facility is legal, complementary, and not highly speculative. The crux of their dispute centers on the fourth required element in determining a subject property's highest and best use—that the use be one that is marketable.

¶ 34. The "marketable" requirement for a subject property's highest and best use stems from Wis. Stat. § 70.32(1), which requires that property be assessed at the "full value" the property could receive in a "private sale." Nestlé correctly notes that this court has consistently interpreted Wis. Stat. § 70.32(1) to require that, when an assessor is determining the highest and best use in which a subject property for sale will produce its "greatest net return to the property owner," a market for that property must exist. *See, e.g., Metropolitan Holding Co. v. Bd. of Review of City of Milwaukee,* 173 Wis. 2d 626, 631, 495 N.W.2d 314 (1993) (An assessor cannot "create a hypothetical market" or "pretend that a

market exists" when determining a subject property's fair market value); *Markarian,* 45 Wis. 2d at 686 (An assessment must be based on a property's "sale value in the open market and [not] its intrinsic value"); *State ex rel. Northwestern Mutual Life Ins. Co. v. Weiher,* 177 Wis. 445, 448, 188 N.W. 598 (1922) (An assessment cannot be based on an imaginary sale "to a supposed purchaser that does not in reality exist"). Therefore, if there is no market in which the Gateway Plant could be sold as a powdered infant formula production facility, a determination that the Gateway Plant's highest and best use is as a powdered infant formula production facility would be invalid under Wis. Stat. § 70.32(1).

¶ 35. Nestlé argues that there is no market for the Gateway Plant in its continued use as a powdered infant formula production facility. Nestlé relies extensively on its interpretation of the Commission's Finding No. 26, which states in relevant part, "neither party could find any instance in the United States where a powdered infant formula manufacturing plant was sold for continued use as a powdered infant formula manufacturing plant." *Nestlé,* Wis. Tax. Rptr. (CCH) ¶ 400–952, at \*34,132. Nestlé contends that the Commission, by concluding in Finding No. 26 that no actual sales of powdered infant formula production facilities had been identified in the United States, is necessarily concluding that there is no market for powdered infant formula production facilities.

¶ 36. Nestlé's interpretation of the Commission's finding is flawed. The Commission concluded that neither party found an instance in the United States where a powdered infant formula production facility was sold for continued use as a powdered infant formula production facility. This finding, however, is *not* analogous to a

finding that there is no market for powdered infant formula production facilities. Wisconsin Stat. § 70.32(1), our case law, and the *Property Assessment Manual* do not demand that evidence of actual sales of properties be put forward to satisfy the "marketable" requirement of a highest and best use determination.

¶ 37. Nestlé's argument that the Commission found there is no market for the Gateway Plant as a powdered infant formula production facility attempts to create a new requirement in our case law where actual sales must be identified when determining a subject property's highest and best use. This "actual sales" interpretation, however, is inconsistent with the objectives of Wis. Stat. § 70.32(1) and would effectively convert our established three-tier system for property assessments into a two-tier analysis.

¶ 38. The purpose in requiring that assessors determine a subject property's highest and best use is to ascertain a property's "greatest net return to the property owner." *Property Assessment Manual,* at 7–9. In other words, the Legislature and this court have concluded it is improper to assess a taxpayer's property at a value that does not equate to what that taxpayer would receive for their property on the open market. This objective to determine a subject property's fair market value, however, does not require actual sales of other properties to be identified. A market can exist for a subject property, especially a special-use property, without actual sales data of similar properties being available.

¶ 39. The instant case illustrates this principle. Here, the FDA implemented its new infant formula standards in 1997. When the Gateway Plant was completed in late 2001, it was the first powdered infant formula production facility constructed to meet these

standards. Under such circumstances it is unsurprising that no actual sales of powdered infant formula production facilities had occurred by 2003 or 2004. This, however, does not inevitably lead to the conclusion that there is no market in which the Gateway Plant could be sold to a potential buyer for the purposes of manufacturing powdered infant formula. Rather, it means only that, in the young industry in which the Gateway Plant was designed and constructed to operate, no similar plants had yet been sold.[14]

¶ 40. Nestlé's "actual sales" interpretation would always force assessors to look for active markets when determining a property's highest and best use, even if the subject property already operated in a thriving, albeit limited, industry.[15] This requirement would result in subject properties in limited markets being

---

[14] The lack of actual sales of powdered infant formula production facilities in 2003 and 2004 is certainly relevant to a determination of whether a market exists for powdered infant formula production facilities, but it is in no way conclusive.

[15] Industry experts have recognized this is a flawed approach in assessing special purpose properties:

> Except for statutes or (faulty) jurisprudence in property tax matters requiring the alternate-use treatment, the highest and best use for viable special-purpose industrial facilities is the use for which they were constructed, unless proven otherwise. The theory that the assessments for property taxes of viable plants should be based upon alternate use arises from the notion that (1) there is a limited market for such properties and (2) the erroneous idea that the appraisal of the highest and best current use is "value-in-use" rather than a market value appraisal.

Max J. Derbes, Jr., *Non-Comparable Industrial Sales*, The Appraisal Journal, Jan. 2002, at 41. When an appraiser is assessing a special purpose property where "the presence of an actual market for that property is extremely thin . . . it is generally recognized that conventional valuation techniques of sales comparison and income approaches are not applicable"

assessed, not at their fair market value, but rather at a value based on the subject properties' costly and hypothetical conversions to alternative uses.[16]

¶ 41. Nestlé's "actual sales" interpretation would also result in replacing our established three-tier assessment framework with a two-tier approach. Under this two-tier approach, valid assessments would be based on only (1) recent sales of the property itself, or (2) recent sales of comparable properties. By requiring actual sales to be identified when determining a subject property's highest and best use, assessors would be required to broaden a property's potential use further and further until actual sales could be located. This interpretation of the "marketable" requirement for

because of limited comparable data. David Paul Rothermich, *Special-Design Properties: Identifying the "Market" in Market Value,* The Appraisal Journal, Oct. 1998, at 410. "Consequently, the cost approach is usually considered the only valid approach in value." *Id.*

[16] Nestlé complains that the Commission created a "hypothetical buyer" when assuming a market exists for the Gateway Plant in its continued use as a powdered infant formula production facility. While the premise of this argument rests on Nestlé's "actual sales" interpretation that we reject today, it is worth noting that Nestlé is also creating a "hypothetical buyer" by assuming a potential buyer would purchase the Gateway Plant after it had been converted to a generic food manufacturing facility. Neither party put forward any evidence of actual sales of converted food manufacturing facilities that had once been powdered infant formula production facilities. This highlights a fact Nestlé overlooks throughout its arguments in this case: markets are necessarily forward-looking. Empirical evidence of past sales activity is certainly informative, but it is not conclusive. Other factors such as changes in consumer demand, industry regulation, and competitor behavior are also important and relevant considerations when engaging in market analysis.

highest and best use determinations results in recent sales of reasonably comparable properties *necessarily* existing. This would, in effect, render obsolete the third-tier assessment methodologies that are well established by Wis. Stat. § 70.32(1), the *Property Assessment Manual,* and our case law. We therefore reject Nestlé's "actual sales" interpretation of the "marketable" requirement for highest and best use determinations.[17]

¶ 42. We find the Commission's conclusion that the Gateway Plant's highest and best use is as its continued use as a powdered infant formula production facility is supported by substantial evidence. Stepanek, the DOR's assessor, relied primarily on three pieces of evidence in reaching this conclusion. First, Stepanek testified there were competitors in the infant formula industry—Mead Johnson, Abbott Laboratories, and Wyeth—that could be potential buyers of the Gateway Plant. Second, Stepanek noted the infant food industry was strong and expanding its capacity. Third, Stepanek found no evidence that powdered infant formula production facilities had ever been converted to other uses.

¶ 43. The only evidence that Nestlé presented was its expert's testimony that no powdered infant formula production facility had ever been sold in Wisconsin for

---

[17] Nestlé also argues that if we accept the Commission's conclusion that the Gateway Plant's highest and best use is as a powdered infant formula production facility, we would be creating an impossible burden by requiring that Nestlé prove the absence of a market. Our case law, however, does not place that burden on Nestlé. In order to prevail in the instant case, Nestlé would have needed to present only sufficient contrary evidence showing that the Commission's acceptance of the DOR's highest and best use determination was incorrect. *Adams,* 294 Wis. 2d 441, ¶ 34.

its continued use as a powdered infant formula production facility. Nestlé presented no evidence refuting Stepanek's findings or otherwise suggesting there is no market for the Gateway Plant in its existing use as a powdered infant formula production facility.

¶ 44. Based on the record before it, the Commission reasonably concluded that the Gateway Plant's highest and best use is as a powdered infant formula production facility. Nestlé, relying exclusively on the fact that no actual sales of powdered infant formula production facilities had been found in Wisconsin, failed to present sufficient contrary evidence to overcome the presumption of correctness given to Stepanek's testimony and report.

¶ 45. Because we agree with the Commission's conclusion that the Gateway Plant's highest and best use is its current use as a powdered infant formula production facility, we further hold the Commission's conclusion that the comparable sales approach was not appropriate for assessing the Gateway Plant is supported by substantial evidence. The comparable sales approach bases the value of the subject property on "the sales of reasonably comparable properties." *Property Assessment Manual,* at 7–18. Both parties agree there were no recently sold food-related manufacturing plants that had been similarly equipped to manufacture powdered infant formula. Because the Gateway Plant's highest and best use is as a powdered infant formula production facility, we agree with the Commission that the general food processing plants relied upon by Nestlé as comparable sales were not "reasonably comparable" to the Gateway Plant.

¶ 46. Nestlé nonetheless argues that the Commission's decision to accept the DOR's assessment

and reject the sales comparison approach in assessing the Gateway Plant directly contradicts our holding in *State ex. rel. Northwestern Mutual Life Insurance Co. v. Weiher*, 177 Wis. 445, 188 N.W. 598 (1922). We disagree.

¶ 47. *Northwestern Mutual* involved the assessment of the original Northwestern Mutual headquarters in Milwaukee, Wisconsin, for property tax purposes. The subject property at issue was "a fine, substantial, artistic building gracing half a block in the city of Milwaukee built to meet the peculiar needs" of Northwestern Mutual Insurance Company. *Id.* at 599. This court concluded there was no market of potential purchasers with needs similar to Northwestern Mutual's, consequently making it unjust to assess the property as if a hypothetical purchaser existed who would value and use the uniquely constructed subject property for the same purposes as Northwestern Mutual.

¶ 48. In the instant case, the Commission never concluded that no market existed for powdered infant formula manufacturers in 2003 or 2004. In fact, Vitale, Nestlé's own assessor, testified a market existed:

Q: Let's talk about markets for infant formula plants. Again, you—are you aware of any powdered infant formula plants selling?

A: No.

Q: Okay. So, is it fair to say that there's no market for powdered infant formula plants?

A: You know, it's hard to say no market, but I call it a limited market because of that.

Vitale's conclusion is consistent with Stepanek's testimony that there were other powdered infant formula

manufacturers in the United States that could be potential purchasers of the Gateway Plant.

¶ 49. *Northwestern Mutual* holds that, in situations where it has been determined there is *no* potential market for the subject property, it is contrary to Wis. Stat. § 70.32(1) to conclude that the highest and best use of the subject property should remain the same. This case is easily distinguishable from *Northwestern Mutual*. In the instant case the DOR's assessor, the Commission, and even Nestlé's own appraiser, all agreed a market existed for powdered infant formula production facilities in 2003 and 2004. Unlike *Northwestern Mutual*, where a "supposed purchaser . . . [did] not in reality exist" for the subject property, both parties in the instant case have agreed that there is at least a limited market for powdered infant formula production facilities. *Id.* Ultimately, Nestlé simply failed to introduce sufficient evidence to support its argument that no market exists for the Gateway Plant to be sold in its continued use as a powdered infant formula production facility.

### C. DOR's Application of Cost Approach is Supported by Substantial Evidence

¶ 50. Nestlé argues, in the alternative, that if the Commission's decision to use the cost approach in assessing the Gateway Plant is correct, the DOR's assessor's application of the cost approach overvalued the property by failing to reduce the assessment for functional obsolescence. We find this argument unpersuasive.

¶ 51. The cost approach method determines the value of improvements by estimating the reproduction or replacement cost of the structure. *Property Assess-*

*ment Manual,* at 7–21. Then, deductions for depreciation, functional obsolescence, and tax-exempt components are subtracted to reach a final value. *Id.*

¶ 52. Nestlé argues that the special features incorporated into the Gateway Plant for the production of powdered infant formula are "super adequacies" that should be deducted from the Gateway Plant's assessment because they do not translate into market value as real estate. This argument, however, turns on 1) the classification of the Gateway Plant's "highest and best use," and 2) whether components of the Gateway Plant are functionally obsolete for *that* use.

¶ 53. We have already held that the Gateway Plant's "highest and best use" is as a powdered infant formula production facility. Therefore, the only remaining issue to be resolved is whether the specialized improvements that make the Gateway Plant suitable for the production of powdered infant formula are functionally obsolete for the plant's continued use as a powdered infant formula production facility.

¶ 54. The Property Assessment Manual defines "functional obsolescence" as "the loss in value, due to a lack of or excessive utility." *Property Assessment Manual,* at 7–26. The Gateway Plant was newly constructed and all of its FDA-required features were being utilized for the purpose of producing powdered infant formula at the time of its assessments in 2003 and 2004. Nothing about the plant can be considered lacking utility during this time period. Therefore, the primary issue is whether functional obsolescence existed as a result of "excessive utility" (also referred to as "super adequacy").

¶ 55. The test for super adequacy is whether a "prudent purchaser or owner would include or would

284

pay for . . . [the greater capacity or quality] in the particular type of structure under current market conditions." *Property Assessment Manual,* at G-40. Nestlé is correct that if the Gateway Plant's specialized features are not marketable, then Nestlé is entitled to a deduction for super adequacy.[18]

¶ 56. Nestlé's argument is unpersuasive, however, because we consider only whether the FDA-required features are marketable in the powdered infant formula production facility sales market. This is so because the market is defined by the property's "highest and best use" both when we consider which assessment method to use and when we consider the appropriateness of a deduction for functional obsolescence. Prudent purchasers of powdered infant formula production facilities would value the Gateway Plant's specialized features because these features are required by FDA regulations and are therefore necessary to the operation of such a plant.

¶ 57. Further, we need not consider whether the FDA-required features are marketable in the broader market of general food processing plants because we have already found them to be marketable in the context of the narrower, relevant market in which the Gateway Plant operates.

---

[18] Nestlé is also correct in pointing out that the Commission mistakenly stated that no functional obsolescence can be found in situations where special features are currently functional for the present owner of the subject property. Whether the special features of a subject property are functional for the present owner is irrelevant to the question of whether functional obsolescence exists for assessment purposes. The key issue in determining if deductions are appropriate for functional obsolescence is whether the special features of the subject property will be functional for a potential buyer.

¶ 58. A reasonable trier of fact could have concluded the specialized features of the Gateway Plant are marketable and Nestlé has not advanced any evidence that the specialized features of the Gateway Plant are unmarketable if the Gateway Plant is sold as a powdered infant formula production facility—its highest and best use. Therefore, we hold that Nestlé has not overcome the presumption of correctness enjoyed by the DOR, and that the court of appeals properly denied Nestlé a deduction for functional obsolescence.

## IV. CONCLUSION

¶ 59. We conclude that Nestlé did not advance sufficient evidence to overcome the presumption of correctness afforded to the DOR's assessment. Nestlé failed to introduce significant evidence that no market existed for the Gateway Plant's sale as a powdered infant formula production facility. Also, we conclude that the Tax Appeals Commission's acceptance of the DOR's determination that the Gateway Plant's "highest and best use" was as a powdered infant formula production facility is supported by substantial evidence. We therefore hold that the DOR properly used the cost method and appropriately denied Nestlé a deduction for functional obsolescence. Accordingly, we affirm the decision of the court of appeals.

*By the Court.*—The decision of the court of appeals is affirmed.