COURT OF APPEALS
DECISION
DATED AND FILED

July 7, 2021

Sheila T. Reiff
Clerk of Court of Appeals

**NOTICE**

This opinion is subject to further editing. If published, the official version will appear in the bound volume of the Official Reports.

A party may file with the Supreme Court a petition to review an adverse decision by the Court of Appeals. *See* WIS. STAT. § 808.10 and RULE 809.62.

Appeal No.     **2020AP393**

STATE OF WISCONSIN

Cir. Ct. No.  **2015CV6376**

**IN COURT OF APPEALS
DISTRICT I**

---

LOWE'S HOME CENTERS, LLC,

PLAINTIFF-APPELLANT,

V.

CITY OF WAUWATOSA,

DEFENDANT-RESPONDENT.

---

APPEAL from an order of the circuit court for Milwaukee County: CLARE L. FIORENZA, Judge. *Affirmed*.

Before Dugan, Graham and White, JJ.

¶1     GRAHAM, J.   Lowe's Home Centers, LLC appeals an order of the circuit court that upheld the 2015 tax assessment of its commercial retail property in the City of Wauwatosa. Lowe's argues that the trial evidence demonstrates that the City did not comply with Wisconsin law when it assessed its property in 2015,

and further, that the court should have credited the single property appraisal prepared by its expert. The circuit court determined that the 2015 assessment complied with Wisconsin law, and that Lowe's did not present significant contrary evidence that the assessment was excessive. We affirm.

## BACKGROUND

¶2 The following facts are taken from the circuit court's findings of fact and the undisputed trial evidence. They are summarized in broad strokes, with additional facts provided in the discussion section below.[1]

¶3 Lowe's is the owner of a 138,515 square foot big box home improvement store located at Burleigh Square in the City of Wauwatosa. Lowe's originally opened its Burleigh Square store in October 2006, and it leased the land on which the store was built from the developer pursuant to a ground lease. The following year, Lowe's executed its contractual right of first refusal to purchase the land. Accordingly, as of 2007, Lowe's owned the land and all improvements on the tax parcel in question. For ease of reference, we refer to the land and improvements collectively as "the Lowe's Property" throughout this opinion.

¶4 The City first assessed the Lowe's Property in January of 2007. At that time, the City determined that its fair market value was $13,614,700. The Lowe's Property continued to be assessed at that same value each year through 2015.

---

[1] The parties disagree about how the trial evidence is properly understood, and each party contends that its opponent's brief mischaracterizes the trial evidence. In this opinion, we rely on our interpretation of the circuit court record rather than either party's characterization of the record.

2

¶5      In 2013, the City conducted a citywide revaluation pursuant to WIS. STAT. § 70.05(5)(b) (2019-20).[2]  This revaluation, which valued all real property in the City using a computer-assisted mass appraisal system, assessed the value of the Lowe's Property as $13,614,700.

¶6      In 2015, after the City again assessed the Lowe's Property at $13,614,700 and after that assessment was entered into the tax roll, Lowe's appealed to the City of Wauwatosa's Board of Review.  The Board subpoenaed documents from Lowe's including, but not limited to, documents related to the costs to acquire and improve the Lowe's Property.  Lowe's also submitted information to the Board about sales of other big box stores that Lowe's considered to be comparable.  By that time, the City's assessor lacked authority to change the assessment for the Lowe's Property because she had already finalized the assessment roll and provided it to the Board.  *See* WIS. STAT. § 70.45.

¶7      After receiving the subpoenaed documents, the Board waived the hearing and declined to alter the assessment.  Lowe's then commenced this action in the circuit court pursuant to WIS. STAT. § 74.37(3)(d).  Both parties hired expert appraisers who prepared single property appraisals to support their respective opinions about the fair market value of the Lowe's Property.

¶8      The circuit court presided over an extensive ten-day bench trial.  The first witness was the City's assessor, Shannon Krause, who was on the stand for three days.  She testified, among other things, that the City is required to assess each parcel in accordance with the *Wisconsin Property Assessment Manual* (2015)

_____

[2] All references to the Wisconsin Statutes are to the 2019-20 version unless otherwise noted.

(hereinafter, the *Assessment Manual*).[3]   She further testified that the 2015 assessment of the Lowe's Property was determined using mass appraisal techniques and not single property appraisal techniques.  According to Krause, she started with the base property values established in the 2013 citywide revaluation and then analyzed sales, rental, and cost data to confirm that the model was justly and equitably applied to all classes of property.

¶9      The expert witnesses retained by Lowe's and the City testified about their respective single property valuation methodologies and professional opinions as to the fair market value of the Lowe's Property.  *See State ex rel. Markarian v. City of Cudahy*, 45 Wis. 2d 683, 685-86, 173 N.W.2d 627 (1970) (providing a three-tier hierarchy for appraising property).[4]   The *Markarian* hierarchy and the experts' methodologies are discussed at length below.  For now, it suffices to say that the expert retained by Lowe's, Michael MaRous, opined that the property's value was $7,100,000 based on a Tier II comparable sales approach.  The City's expert, William Miller, testified that a Tier II comparable sales approach was not an appropriate appraisal methodology because there were no reasonably

---

[3] The parties relied on the 2015 edition of the *Assessment Manual* during trial, and all subsequent references are to the 2015 version unless otherwise noted.

[4] As discussed in greater detail below, Tier I considers a recent arm's-length sale of the property in question and is not at issue here because there has not been a recent arm's-length sale of the Lowe's Property.  *Nestlé USA, Inc. v. DOR*, 2011 WI 4, ¶28, 331 Wis. 2d 256, 795 N.W.2d 46.  Tier II extrapolates fair market value based on recent sales of comparable properties and is only a viable methodology if the recent sales are of properties that are reasonably comparable.  *Regency West Apartments LLC v. City of Racine*, 2016 WI 99, ¶¶28, 70, 372 Wis. 2d 282, 888 N.W.2d 611.  Tier III encompasses other valuation techniques, most prominently the cost and income approaches.  *Nestlé USA*, 331 Wis. 2d 256, ¶29.

comparable sales. Miller testified that the property's fair market value was $17,330,000 based on his Tier III analysis of cost and income.[5]

¶10    In January 2020, the circuit court issued a written decision upholding the City's assessment. The court determined that Lowe's had not overcome the presumption of correctness afforded to assessments by WIS. STAT. § 70.49(2). As discussed in greater detail below, the court found that Krause conducted a mass appraisal in 2015, and that Lowe's failed to identify any aspect of the mass appraisal that did not comply with Wisconsin law and the *Assessment Manual*.

¶11    The circuit court also considered the testimony and evidence from both experts' single property appraisals and determined that Lowe's failed to show that the 2015 assessment of the Lowe's Property was excessive. This determination was based largely on the court's conclusion that the appraisal offered by MaRous did not comply with Wisconsin law and the *Assessment Manual*. The court explained that, while MaRous acknowledged that the highest and best use of the Lowe's Property is continued retail use, he based his opinion on sales that were not comparable and "generated conclusions [about] the value of the Property as if it were [to be] redeveloped and sold for multi-tenant use." As for MaRous's Tier II analysis, the court found that the sales that MaRous considered were not reasonably comparable to the Lowe's Property. It also found that MaRous's Tier III cost approach analysis made "excessive adjustments for functional obsolescence" premised on "speculative redevelopment." Finally, it

---

[5] The circuit court also heard testimony from Dr. Thomas Hamilton who testified for the City and David Lennhoff who testified for Lowe's. Neither of these experts personally appraised the Lowe's Property; both generally testified about assessment practices and valuation techniques. The court found that Dr. Hamilton's experience was relevant and that his testimony was credible, in contrast to the testimony offered by Lennhoff.

found that MaRous's Tier III income approach "estimated the potential net income based on dark, vacant, and deed-restricted properties in locations with different economics from Wauwatosa." For these and other reasons, the court discredited MaRous's opinion about the fair market value of the Lowe's Property.

¶12 On the other hand, the circuit court determined that the City's expert, Miller, "properly determined that there were no reasonably comparable sales sharing the highest and best use" of the Lowe's Property and "properly moved to a Tier III analysis using cost and income approaches." The court further determined that Miller's appraisal was credible and consistent with Wisconsin law and the *Assessment Manual*. Therefore, the court concluded that Miller's appraisal provided significant support for the City's assessment.

## DISCUSSION

¶13 This appeal requires us to review the circuit court's decision that rejected the challenge Lowe's made to the 2015 tax assessment of the Lowe's Property.

¶14 "The question on appeal in a WIS. STAT. § 74.37 action is not whether the initial assessment was incorrect, but whether it was excessive." *Metropolitan Assocs. v. City of Milwaukee*, 2018 WI 4, ¶40, 379 Wis. 2d 141, 905 N.W.2d 784. "Whether a [taxing authority] has erroneously failed to follow statutory requirements in making an assessment is a question of law that we review de novo." *Walgreen Co. v. City of Madison*, 2008 WI 80, ¶17, 311 Wis. 2d 158, 752 N.W.2d 687; *see also Regency West Apartments LLC v. City of Racine*, 2016 WI 99, ¶22, 372 Wis. 2d 282, 888 N.W.2d 611. When there is conflicting evidence, we defer to the circuit court's findings of fact and will not disturb such findings unless they are clearly erroneous. *Bonstores Realty One,*

*LLC v. City of Wauwatosa*, 2013 WI App 131, ¶6, 351 Wis. 2d 439, 839 N.W.2d 893. "The weight and credibility to be given to the opinions of expert witnesses is 'uniquely within the province of the fact finder.'" *Adams Outdoor Advert., Ltd. v. City of Madison*, 2006 WI 104, ¶27, 294 Wis. 2d 441, 717 N.W.2d 803 (citation omitted); *see also* *Bonstores*, 351 Wis. 2d 439, ¶6.

¶15    We begin by setting forth background information about the annual assessment process and the pertinent legal standards for assessments that govern this appeal. We then address whether the evidence supports the circuit court's determination that the City conducted a mass appraisal that complied with Wisconsin law and the *Assessment Manual* when it assessed the value of the Lowe's Property in 2015. Finally, we consider the experts' single property appraisals to determine whether the court erred when it concluded that Lowe's failed to prove that the 2015 assessment was excessive.

## I.  The Pertinent Legal Standards and Background of the 2015 Assessment

¶16    Under Wisconsin law, "[r]eal property shall be valued by the assessor in the manner specified in the Wisconsin property assessment manual ... from actual view or from the best information that the assessor can practicably obtain, at the full value which could ordinarily be obtained therefor at private sale." WIS. STAT. § 70.32(1). "This statute requires adherence to the [*Assessment Manual*] absent conflicting law." *Allright Props., Inc. v. City of Milwaukee*, 2009 WI App 46, ¶10, 317 Wis. 2d 228, 767 N.W.2d 567.

¶17    Additionally, WIS. STAT. § 70.05(5)(b) provides that "[e]ach taxation district shall assess property at full value at least once in every 5-year period." This is usually accomplished in what this statute and the *Assessment Manual* refer

to as a "revaluation," which is a significant undertaking for a taxation district. WIS. STAT. § 70.05(5)(b); *Assessment Manual* at 4-1 & ch. 19.

¶18    Wisconsin Statutes and the *Assessment Manual* recognize that property values are likely to change somewhat in the years following a revaluation.    One of an assessor's primary responsibilities is determining whether adjustments to property assessment values are necessary to ensure that they are fair and equitable.    *See generally*, *Assessment Manual* ch. 4.    The *Assessment Manual* describes this process as follows:

> Each year the governing body selects the type of assessment that will be conducted for the current assessment year.…
>
> Assessments fall into two broad categories: maintenance and revaluation.    Maintenance consists of copying the assessment roll from the previous year and updating values to the current level of assessment when changes warrant.    Examples of changes include new construction, combining or splitting of parcels, remodeling, demolition, annexation and zoning changes, changes in classification, and any other occurrence that might affect value or the attributes of the parcel.    These changes may, or may not, result in a change in value; nonetheless each of these requires the Property Record Card (PRC) to be updated.…
>
> Sometimes maintenance is not enough to meet the requirements of fair and uniform assessments.    At these times, a revaluation is needed.    Revaluation refers to assessment of all parcels in the municipality.    This is periodically necessary because economic conditions are constantly changing.…
>
> Other situations arise that are less extreme. Maintenance is not enough, but the expense of a full revaluation isn't justified.    Perhaps a full revaluation was conducted in the past five years and property record cards seem largely accurate, yet certain neighborhoods seem to be increasing or decreasing in value faster than others.    Or perhaps the property record cards are reasonably reliable but the governing body wants exterior viewings conducted to ascertain what's happening in various neighborhoods or

> for some other compelling reason (for example, the effect of flood damage). Each of these situations requires a different work effort on the part of the assessor.

*Id.* at 4-1; *see also id.* at 4-3 (describing tasks by assessment type).

¶19　Once an assessor prepares the annual assessment roll, the roll is open for inspection by taxpayers. *See* WIS. STAT. § 70.45 (return and examination of rolls). Following an open book period, the assessor submits the roll and an affidavit stating that, among other things, "the valuations of real and personal property for the present year … have been made with the best information available using professionally accepted appraisal practices." *Assessment Manual* at 4-19; *see also* WIS. STAT. §§ 70.45, 70.49(1) (affidavit of assessor), 70.50 (delivery of roll). Taxpayers may challenge an assessment with the board of review for the taxing district, as Lowe's did in this case. *See* WIS. STAT. § 70.47.

¶20　Provided that statutory requirements are met, taxpayers may also file an action in circuit court pursuant to WIS. STAT. § 74.37(3)(d) to recover from excessive assessments. When considering such challenges, the court begins with the presumption that the assessed value is correct upon entry of that value into the assessment roll and submission of the assessor's affidavit. WIS. STAT. § 70.49(2); *see also* ***Bonstores***, 351 Wis. 2d 439, ¶5; ***Adams Outdoor Advert.***, 294 Wis. 2d 441, ¶25. The source of this presumption is § 70.49(2), which states:

> The value of all real and personal property entered into the assessment roll to which such affidavit is attached by the assessor shall, in all actions and proceedings involving such values, be presumptive evidence that all such properties have been justly and equitably assessed in proper relationship to each other.

¶21　Here, it is undisputed that the Lowe's Property was assessed at $13,614,700 in 2015, and that this value was entered into the assessment roll. It is

also undisputed that the City's assessor, Shannon Krause, signed and submitted the requisite affidavit. Consequently, the City is entitled to a presumption that the assessment was "justly and equitably" made, giving rise to a presumption of correctness. WIS. STAT. § 70.49(2); *see also* **Bonstores**, 351 Wis. 2d 439, ¶10 ("Because both parties agreed that the property was assessed at $25,593,300, the City has met its burden of establishing the presumptive fair market value of the property.").

¶22    A taxpayer may overcome the presumption of correctness by presenting "significant contrary evidence." **Allright Props.**, 317 Wis. 2d 228, ¶12 (citation omitted). The taxpayer may demonstrate that the assessor did not comply with Wisconsin law when assessing the property, *see* **Regency West**, 372 Wis. 2d 282, ¶¶3-4, 22, or that the assessment is excessive, *see* **Metropolitan Associates**, 379 Wis. 2d 141, ¶50. "[W]hen a city assessor correctly applies the *Property Assessment Manual* and Wisconsin statutes, and there is no significant evidence to the contrary, courts will reject a party's challenge to the assessment." **Allright Props.**, 317 Wis. 2d 228, ¶12 (citation omitted).

¶23    Here, Lowe's argues that the 2015 assessment is not entitled to the presumption of correctness because the City's assessor, Krause, did not actually undertake a mass appraisal to determine the value of the Lowe's Property as of January 1, 2015. Lowe's also argues that MaRous's single property appraisal shows that the assessment was excessive, and that the circuit court erroneously discredited it. We address these arguments in turn.

## II. The City's Initial Assessment Using Mass Appraisal

¶24    The *Assessment Manual* identifies assessment techniques generally applicable to commercial property. It explains that "[e]stimates of market value

10

can be derived by using the cost, income and/or sales comparison approaches," and further, that "[c]ommercial property can be valued by either single property or mass appraisal techniques." *Assessment Manual* at 9-7.

¶25 "Mass appraisal is the systematic appraisal of groups of properties, as of a given date, using standardized procedures and statistical testing." *Id.* at 7-41. "The purpose of mass appraisal is the equitable and efficient appraisal of all property, in a jurisdiction, for ad valorem tax purposes." *Id.* Unlike single property appraisal, mass appraisal "requires the development of a valuation model" that is "capable of replicating the forces of supply and demand over a large area" and that "recreates mathematically, the changes in value and real estate activity happening in the particular town, village, or city being assessed." *Id.* According to the *Assessment Manual*, "[m]ass appraisal is the underlying principle that Wisconsin assessors should be using to value properties in their respective jurisdictions." *Id.*[6]

¶26 Our supreme court approved the use of mass appraisal in *Metropolitan Associates*, 379 Wis. 2d 141. The court noted that the practice is "equitable and efficient," is "widely used throughout the country," *id.*, ¶44, and is consistent with statutory requirements, *id.*, ¶¶26-45. As the court explained, "the best information the City can 'practicably' obtain" at the initial assessment stage

---

[6] The *Assessment Manual* explains that an assessor "need[s] skills in both mass appraisal and single property appraisal." *Assessment Manual* at 7-12. Mass appraisal is used "for producing initial values, whether during a reappraisal year or not," and single property appraisal is used "to defend specific property values or to value special purpose properties that do not lend themselves to mass appraisal techniques." *Id.* at 7-41; *see also Metropolitan Assocs. v. City of Milwaukee*, 2018 WI 4, ¶36, 379 Wis. 2d 141, 905 N.W.2d 784. Here, consistent with the *Assessment Manual* and *Metropolitan Associates*, the circuit court found that the City valued the Lowe's Property through mass appraisal, and the City defends against this lawsuit with a single property appraisal prepared by its expert, William Miller.

"is often that underlying a mass appraisal," and "[c]ompleting annual assessments in a major metropolitan area would simply not be feasible without the use of mass appraisal." *Id.*, ¶¶45, 43. Lowe's does not challenge the holding of ***Metropolitan Associates***. It concedes that, provided that a mass appraisal was actually undertaken in 2015, it was lawful for the City to use that mass appraisal to establish its initial assessment of the Lowe's Property.

¶27 In this case, after considering the evidence, the circuit court found that Krause valued the Lowe's Property in 2015 in a mass appraisal using the best information practicably available to the City. The court made the following findings of fact:

> The City Assessor used the mass appraisal model in the valuation of the 2015 year. She testified she used the base values established in the 2013 citywide revaluation, then analyzed sales and rental information to confirm that the model was being justly and equitably applied to the subsets of property within the City, including large retail properties like the Lowe's property.
>
> Ms. Krause testified that in order to ensure the 2013 mass appraisal model was justly and equitably applied in 2015, she performed an income and cost approach analysis to support her assessment. In support of her analysis, she considered various sales of other large retail properties throughout the state, rental rates for new construction, and the Assessor's Annual Report.
>
> ….
>
> Accordingly, Ms. Krause found that the 2013 mass appraisal model was justly and equitably applied to the Property in 2015 and declined to make any adjustments. Ms. Krause confirmed the value of the Property was $13,614,700 as of January 1, 2015. She set the 2015 assessment based upon the best information practicably available to her.

¶28 These findings of fact are not clearly erroneous. Krause was on the stand for three days, and her testimony provides ample evidence to support the

circuit court's findings.[7]  Therefore, we conclude that the court did not err when it determined that Krause conducted a mass appraisal that was consistent with the requirements of Wisconsin law and the *Assessment Manual*.  *See supra* ¶¶18, 24-26.  Our conclusion is bolstered by the fact that Lowe's does not identify any flaw in the computer-assisted mass appraisal model that Krause used, nor does it identify any additional information that Krause should have obtained.

¶29    Instead, Lowe's asks us to disregard Krause's testimony as "smoke and mirrors."   According to Lowe's, Krause's testimony "evidences that she conducted virtually no mass appraisal analysis *of the value of the subject property* as of January 1, 2015," and that she simply "carried over" the assessment from prior years and "rubberstamped" it without analysis.  (Emphasis added.)  Lowe's points out that "the City offered no summary, notes, or any other documentary evidence of any assessment analysis" of the value of the Lowe's Property as of January 1, 2015.  The crux of its argument is that the circuit court should have discredited Krause's testimony and found that she did not actually assess the value of "the subject property" as of January 1, 2015.

¶30    The argument Lowe's advances appears to be founded on the flawed premise that, during a maintenance year, an assessor must individually analyze

_____

[7] Specifically, Krause explained that every property in the City had been reevaluated in 2013 using a mass appraisal model that set a value for each property.  She started with those base values and analyzed new data to ensure that the model was still justly and equitably being applied against subsets of property in 2015.  As Krause explained, "[e]ach year after a revaluation you're reviewing additional information that becomes available to see that that base model year from the revaluation is still being equitably applied," and that "you're testing that initial mass appraisal model to make sure that it is still justly and equitably applied against those properties within its class or subclass."  Krause further testified that in 2015, she analyzed market evidence, rental rates, and recent sales.  In addition, Krause elaborated on how she specifically reviewed the confidential data that had been generated for the Lowe's Property during the 2013 revaluation and determined that the data had not changed, and that the analysis was still fair and equitable.

properties in the taxing district to determine whether there has been a change in value, and that the assessor must have documentary evidence to prove it. Yet Lowe's points to no statute or other legal authority to support such a requirement, and its argument would undermine the concept of a mass appraisal in its entirety. As shown above, properties must be evaluated at full market value at least once every five years, and the *Assessment Manual* does not require individual properties to be updated in maintenance years unless some change would justify an update. *See supra*, ¶18. Examples of such changes include specific changes to a particular parcel (for example, "new construction, combining or splitting of parcels, remodeling, demolition, annexation and zoning changes, changes in classification") or market-based evidence of significant changes in value to particular neighborhoods or classes of property. *Assessment Manual* at 4-1. Here, Krause testified that there was no information that would justify a change in value of the Lowe's Property in 2015, and the circuit court credited that testimony.[8] We reject the argument advanced by Lowe's because it is based on a fundamental misunderstanding of Wisconsin law and the *Assessment Manual*.

¶31 Finally, Lowe's attempts to cast doubt on whether the Lowe's Property was actually reevaluated in 2013, noting that the value did not change

---

[8] Krause also testified that she completed the 2015 Annual Assessment Report (AAR) required by the Department of Revenue. The purpose of an AAR is to determine the overall accuracy of a mass appraisal using statistical testing to decipher whether a municipality's mass appraisal values are in proper relationship to market sales. Krause testified that in the process of completing the AAR, her office analyzed sales that occurred in the local community: "We outline our neighborhoods, residential and commercial. We list all the sales activity, sales ratio analysis, how many inspections we did, how many sale inspections, how many permit inspections, the change of value." Krause's testimony about this process further undermines any argument that Krause did nothing in 2015 but "rubberstamp" the values determined in the 2013 revaluation.

from the original assessment in 2007.[9] Lowe's did not formally challenge the 2013 assessment, and we question whether this issue is properly before this court. Yet, putting that concern to the side, there was ample evidence that the Lowe's Property was reevaluated as part of the 2013 revaluation. Krause testified that in 2013, the City's mass appraisal model determined that the fair market value of the Lowe's Property was $13,782,900—a $168,200 *increase* from the original assessed value of $13,614,700. Because the City concluded that the increase was not significant and the fair market value was "substantially the same" as it had been in prior years, the City opted not to increase the assessment of the Lowe's Property in the 2013 revaluation.[10] Simply put, contrary to the argument made by Lowe's, the fact that the assessed value of the Lowe's Property has been constant

---

[9] Lowe's relies on a single sentence of the *Assessment Manual*, which provides that "[a]ssessments should not be carried over from year to year with no adjustments." *Assessment Manual* at 19-19. Lowe's reads this sentence of the *Assessment Manual* in isolation. However, the remainder of the paragraph makes clear that what is required is annual *review*, not necessarily a *change* in assessed value:

> Property values are continually changing, and the values do not change at the same rate for all properties. With no changes in the assessments, inequities will soon develop. Therefore, *they should still be reviewed annually* and sales analyses performed to determine if specific classes or types of property need to be adjusted to maintain equity in the assessments.

*Id.* (emphasis added).

[10] Whether the City's decision to overlook this increase in value was equitable to other taxpayers in the City is not at issue in this case. *See Trailwood Ventures, LLC v. Village of Kronenwetter*, 2009 WI App 18, ¶10, 315 Wis. 2d 791, 762 N.W.2d 841 (determining that WIS. STAT. §§ 74.37 and 74.39 do not permit the court to impose a greater tax burden than the one the taxpayer challenges).

15

over a period of years does not undermine our confidence in the circuit court's decision.[11]

¶32 In sum, Lowe's has not met its burden to show that a mass appraisal did not occur or that the system and procedures that the City employed in 2015 failed to comply with Wisconsin law or the *Assessment Manual*. Accordingly, Lowe's has not overcome the presumption of correctness with its arguments about the 2015 mass appraisal. ***Regency West***, 372 Wis. 2d 282, ¶¶3-4, 22.

### III. The Single Property Appraisals

¶33 We now turn to the single property appraisals and the expert testimony offered by Michael MaRous (for Lowe's) and William Miller (for the City). Our analysis occasionally discusses Miller's analysis and the circuit court's findings about his appraisal. However, since Lowe's has the burden to present significant contrary evidence to overcome the presumption of correctness, the focus of our discussion in this section is the appraisal offered by MaRous. Based on an analysis of comparable sales, MaRous opined that the fair market value of the Lowe's Property as of 2015 was $7,100,000, and he "supported" his

---

[11] As a possible corollary to this argument, Lowe's asserts that there is an "oversupply" of big box retail stores on the market in Milwaukee County following the "Great Recession" of 2008 and the "Retail Apocalypse" that followed, and that Lowe's and other big box retailers have closed retail locations in Milwaukee County due to the recession and other market forces. Although its briefs do not specifically connect the necessary dots, we understand Lowe's to be arguing that the market value of the Lowe's Property must have decreased at some point between 2007 and 2015. Again, Lowe's did not formally challenge prior assessments, and the question for trial was the market value of the Lowe's Property on January 1, 2015. The circuit court heard testimony about big box store closings in failed retail locations in and around Milwaukee County, and it also heard testimony that the market in Wauwatosa had long since rebounded from the 2008 recession. The fact that some retailers closed stores in other unsuccessful retail locations does not necessitate the conclusion that there is an oversupply of big box stores in Wauwatosa or that the market value of the Lowe's Property must have been lower in 2015 than it was in 2007.

comparable sales analysis with analyses under the cost and income approaches. Lowe's argues that the court erroneously discredited MaRous's analysis, and that the court should have determined that the 2015 assessment is excessive based on his opinion.

¶34 For reasons we explain below, we conclude that the circuit court did not clearly err when it determined that MaRous's opinions were not credible. As we have explained, "[t]he weight and credibility to be given to the opinions of expert witnesses is 'uniquely within the province of the fact finder.'" *Adams Outdoor Advert.*, 294 Wis. 2d 441, ¶27 (citation omitted). Here, the court sufficiently explained its reasons for determining that MaRous's sales comparison, cost, and income approaches were not credible, and Lowe's does not persuade us that the court erred.

## A. The *Markarian* Hierarchy

¶35 We begin our discussion by elaborating on the *Markarian* hierarchy. In so doing, we explain why "highest and best use" is often a "determinative factor" in an analysis of the value of real property. *Nestlé USA, Inc. v. DOR*, 2011 WI 4, ¶32, 331 Wis. 2d 256, 795 N.W.2d 46.

¶36 As mentioned above, Wisconsin law and the *Assessment Manual* set forth a three-tiered valuation methodology, commonly referred to as the *Markarian* hierarchy, for determining the full market value of real property. *Nestlé USA*, 331 Wis. 2d 256, ¶28. Starting with Tier I, an appraiser looks to "[e]vidence of a recent arm's-length sale of the subject property" as "the best evidence of full value." *Id.* If, as here, "the subject property has not been recently sold," the appraiser should move to Tier II and "consider sales of reasonably comparable properties." *Id.* "Only in situations where there has been no arm's-

17

length sale of the subject property and there are no reasonably comparable sales may an [appraiser] use one of the third-tier assessment methodologies." ***Id.*** The common Tier III methodologies are the cost and income approach, both discussed in greater detail below.

¶37 Regardless of the methodology used, all property must be assessed at its "highest and best use," which should not be speculative. ***Id.***, ¶27; *Assessment Manual* at 7-12. A determination of highest and best use is a "threshold issue" which will drive the decisions made in any Tier II or Tier III analysis. ***Nestlé USA***, 331 Wis. 2d 256, ¶32; ***Allright Props.***, 317 Wis. 2d 228, ¶18. This is because, if a property is appraised for some use other than its highest and best use, the resulting appraisal will undervalue the property. *See, e.g.*, *Assessment Manual* at 7-12.

## B. The Lowe's Property's Highest and Best Use

¶38 A recurring reason that the circuit court provided for discrediting MaRous's appraisal was the court's determination that MaRous did not properly determine the highest and best use of the Lowe's Property. According to the court, this flaw fatally infected both his Tier II and Tier III analyses.

¶39 In his written report, MaRous opined that "the highest and best use of the subject property is to continue to market it for an alternative big box user or to redemise the space for multi-tenant [use]." MaRous's report expressly acknowledged that the second option, redemising the building for multi-tenant use, would "likely require an extensive amount of capital improvements … and is likely to not be economically feasible." Nevertheless, as we discuss in greater detail below, MaRous conducted his Tier II and Tier III approaches as if the Lowe's Property was vacant and its highest and best use was to redevelop it for

18

another use. More specifically, MaRous valued the improvements on the Lowe's Property as if it were to be sold and repurposed for "alternative" uses such as "a flea market, a health club, a craft store, supermarkets, and other secondary commercial uses." Thus, MaRous ultimately valued the Lowe's Property for a use that he had determined was not "economically feasible."

¶40     The circuit court found that MaRous's opinion "is discredited by his position on the foundational issue of highest and best use." According to the court, "the whole of MaRous's report and testimony is highly speculative because it values the Lowe's Property in a condition that it is not in." As the court explained, "[r]ather than opining to a single highest and best use," MaRous "speculates as to multiple highest and best uses" for the Lowe's Property and then "generate[s] conclusions based on the value of the Property if it were redeveloped and sold for multi-tenant use." The court ultimately concluded that MaRous's "approach is inconsistent with Wisconsin law and the Manual and discredits [his] findings for each tier of his analysis."

¶41     By contrast, the circuit court found that Miller identified a single narrow use for the Lowe's Property that would achieve the greatest net return for the owner. As the court explained, "Miller's testimony—that the … single highest and best use is continued use as a retail store—is consistent with Wisconsin law and the Manual, and credible." Ultimately, the court determined that there were "numerous characteristics of the Lowe's property that are advantageous for its use as a home improvement store," and that its highest and best use is "continued use" as a big box home improvement store.

¶42     Lowe's disagrees with the circuit court's determination of highest and best use for several reasons. None of these arguments are persuasive.

19

¶43    First, Lowe's argues that, although MaRous "considered" multiple potential uses for the Lowe's property, he ultimately testified that the highest and best use was "continued big box retail use." Lowe's accurately quotes MaRous's testimony—but we read this testimony as an admission that undermines his appraisal. That is, MaRous acknowledged that the highest and best use was continued use for big box retail, yet the assumptions and calculations he used to generate values were not consistent with that use. As discussed below, he instead generated Tier II and III values based primarily on data from former big box properties that were sold to be redeveloped for other uses.

¶44    Second, Lowe's argues that the circuit court's determination that the highest and best use is as a big box home improvement retailer is "impermissibly narrow." We disagree based on our supreme court's reasoning in *Nestlé USA*, 331 Wis. 2d 256.

¶45    In *Nestlé*, the property at issue was a powdered infant formula production facility designed to meet rigorous federal standards specific to that use. *Id.*, ¶1. The parties disputed whether the highest and best use of the property was its current use as an infant formula processing plant or more general use as a food processing plant. *Id.*, ¶8. There were no recorded sales of infant formula production facilities throughout the United States, and Nestlé argued that the facility should be assessed as a food processing plant because there were actual sales for that use. *Id.*, ¶6. The court rejected Nestlé's argument. As it explained, the "actual sales" approach "would always force assessors to look for active markets when determining a property's highest and best use, even if the subject property already operated in a thriving, albeit limited, industry." *Id.*, ¶40. That approach is untenable because it "would result in subject properties in limited markets being assessed, not at their fair market value, but rather at a value based

on the subject properties' costly and hypothetical conversions to alternative uses." *Id.* The court concluded that the highest and best use was the use for which the property was specifically designed—an infant formula production facility—and that it should be assessed based on that use. *Id.*, ¶9.

¶46 Here, consistent with *Nestlé*, the circuit court's highest and best use determination places value on the physical features that make the Lowe's Property especially advantageous to its current use as a big box home improvement store. Those features include "the high ceilings, large truck bays, heavily reinforced floor, outside lawn and garden center, and the warehouse style finish." As in *Nestlé*, the circuit court found that "these features might devalue the Property if it were sold to be redeveloped for multi-tenant use," but they "reflect" its value "in its current, highest and best use as a big box home improvement store."

¶47 Third, Lowe's argues that Miller testified inconsistently about the highest and best use of the Lowe's Property, and that his determination of highest and best use improperly considered Lowe's as a potential buyer of the property contrary to *State ex rel. Northwestern Mutual Life Insurance Co. v. Weiher*, 177 Wis. 445, 188 N.W. 598 (1922). We question the accuracy of this characterization of Miller's testimony, but there is no need to belabor the point. Unlike in *Northwestern Mutual*, the circuit court's decision shows that it did not improperly place value on any "intrinsic worth" or unique features valuable only to Lowe's. Instead, as in *Nestlé*, the court's highest and best use determination places value on the attributes of the real estate that would be valuable to any retailer who sold similar products.

¶48 The final argument advanced by Lowe's is based on a flawed extension of legal principles from *Walgreen Co. v. City of Madison*

21

(*Walgreen/Madison*), 311 Wis. 2d 158, and *Walgreen Co. v. City of Oshkosh* (*Walgreen/Oshkosh*), No. 2013AP2818, unpublished slip op. (WI App Dec. 17, 2014).[12]   Lowe's contends that the circuit court's highest and best use determination inflates the assessment based on the value of the "business concern that [is] using the property," contrary to *Walgreen/Madison* and *Walgreen/Oshkosh*.  As we now explain, its reliance on these cases is inapt.

¶49   The issue in both *Walgreen* cases was "whether a property tax assessment of retail property leased at above market rent values should be based on market rents" (as Walgreens argued), or instead on "the above market rent terms of Walgreens' actual leases" (as argued by the taxing authorities). *Walgreen/Madison*, 311 Wis. 2d 158, ¶2.  The key to both cases was "the nationally recognized principle that '[a] lease never increases the market value of real property rights to [a] fee simple estate.'"  *Id.*, ¶3 (citation omitted).

¶50   As explained in *Walgreen/Madison*, Walgreens' business model was to contract with a real estate developer, who would acquire property and build retail stores to Walgreens' specifications.  *Id.*, ¶6.  Walgreens would then lease these stores from the developer at above-market rates to compensate the developer for its land acquisition, construction, development, and financing costs.  *Id.* Property is typically assessed at the price it would sell for in an arm's-length transaction, and it was undisputed that an arm's-length buyer would pay more for the Walgreens property than for an equivalent property that did not have an

_____

[12] *See* WIS. STAT. RULE 809.23(3)(a) and (b) (generally, an "unpublished opinion may not be cited in any court of this state as precedent or authority," but an "unpublished opinion issued on or after July 1, 2009, that is authored by a member of a three-judge panel … may be cited for its persuasive value").

income stream generated from Walgreens' above-market rents. *See id.*, ¶33; *see also id.*, ¶94 (Abrahamson, C.J., concurring). Based on these principles, the taxing authority assessed the Walgreens property to reflect that increased value. Walgreens challenged the assessment, arguing that the assessment conflated "property value and contract value," and that "the increased value" added by favorable lease terms "is not a real property value subject to taxation." *Id.*, ¶33. Our supreme court agreed, concluding that the assessment was improperly inflated to reflect the value of "contract rights" above and beyond "the bundle of [real] property rights ordinarily considered at a property sale." *Id.*, ¶66.

¶51     Likewise, in *Walgreen/Oshkosh*, Oshkosh's tax assessment was based on the actual sale price of a Walgreens property. No. 2013AP2818, unpublished slip op., ¶¶5-6, 14. As had been predicted in *Walgreen/Madison*, the sales price was inflated due to the value of the income stream of Walgreens' above-market rents. *Id.*, ¶2. When Walgreens challenged the assessment, the parties' arguments revolved around highest and best use. Oshkosh argued that the Walgreens property's highest and best use was "continued use as 1st generation drug stores" and consequentially included only "investment grade real estate." *Id.*, ¶¶12-13. We disagreed. The problem was *not* that Oshkosh identified the highest and best use as "continued use" as a drug store. *Id.*, ¶13. Instead, the problem was that the "investment grade real estate" Oshkosh identified as comparable had the same problem identified in *Walgreen/Madison*—the "the value of the real estate" was inflated by "the creditworthiness of the tenant" and "the value of the lease itself." *Id.* Thus, by restricting the highest and best use to investment-grade real estate, the assessment impermissibly valued the "business concern" that might use the property. *Id.*, ¶2.

¶52    In summary, in both *Walgreen* cases, the assessments improperly valued a *contract right* to an income stream as if it were a *property right*. *Walgreen/Madison*, 311 Wis. 2d 158, ¶3; *Walgreen/Oshkosh*, No. 2013AP2818, ¶11. This violated the principles of fee simple valuation and the concept that "'[a] lease never increases the market value of real property rights to the fee simple estate.'" *Walgreen/Madison*, 311 Wis. 2d 158, ¶3 (citation omitted); *Walgreen/Oshkosh*, No. 2013AP2818, ¶11 (citation omitted).

¶53    Here, by contrast, there is no "income stream" or "contract right" that factored into the circuit court's determination of highest and best use. Instead, as discussed above, the court's determination accounts for attributes of the Lowe's Property that would be valuable to any retailer that sold similar products.

¶54    For all of these reasons, we conclude that the circuit court's highest and best use determination is not clearly erroneous. As shown below, that determination undergirds many of the court's reasons for determining that MaRous's appraisal was not credible.

### C. Tier II Sales Comparison Approach

¶55    We now turn to whether the circuit court's decision to reject MaRous's Tier II comparable sales analysis is clearly erroneous. The Tier II sales comparison approach "relies on recent market sales of similar properties to predict the probable market price of the subject." *Assessment Manual* at 7-23. As the *Assessment Manual* explains, this approach "is predicated on the principle of substitution; that the typical buyer will pay no more for a property than it would cost to buy a reasonably comparable property." *Id.*

¶56    According to the *Assessment Manual*, the sales comparison approach "is the preferred method of estimating market value provided the comparable sales are arm's-length transactions," and it "should be used to arrive at market value if comparable sales data is available." *Id.* at 9-12. The advantage of the sales comparison approach is that it "reflect[s] the actions and decisions of buyers and sellers in the marketplace." *Id.* The disadvantage is the difficulty of finding comparable sales, especially when appraising larger retail stores. *Id.*[13]

¶57    For properties to be "reasonably comparable," they must "represent the 'subject property in age, condition, use, type of construction, location, design, [and] physical features….'" *Regency West*, 372 Wis. 2d 282, ¶28 (quoting *Wisconsin Property Assessment Manual* 7-22 (2011)).

¶58    Additionally, commercial properties should be similar in "economic characteristics including similarities in the ability to generate income and/or similar income streams." *Assessment Manual* at 9-12. To that end, our supreme court has explained that "reasonably comparable" properties "must have 'similar restrictions' to the subject property." *Regency West*, 372 Wis. 2d 282, ¶34; *see also id.*, ¶58 (determining that Section 42 housing units are not reasonably comparable to other subsidized rental properties because the income and rent restrictions imposed by Section 42 result in a different ability to generate income). Similarly, this court has cautioned against using "dark stores" as reasonably

---

[13] The *Assessment Manual* cautions: "Because of the wide variety of commercial properties it may be difficult to find comparable sales." *Assessment Manual* at 9-12. It elaborates on this point as follows: "The sales comparison approach is often used to value smaller retail stores. Because smaller retail stores may be easily adapted to other retail uses, sales of these stores can be used as comparable sales …." *Id.* at 9-40. However, "[f]or the larger stores and those smaller stores for which there are no comparable sales, the assessor should use the income and/or cost approaches." *Id.*

comparable properties to determine the value of a store that is not dark. *Bonstores*, 351 Wis. 2d 439, ¶¶21-22. As we understand *Bonstores*, a dark store is a store that is vacant, either because the retailer that occupied it has gone out of business or because the retailer moved to another location. *Id.*, ¶¶20-21. Lowe's focuses its argument on *Bonstores*, and we discuss that case at greater length below.

¶59 Although the Tier II comparable sales approach is the preferred method of estimating market value, Wisconsin law "does not permit" the use of "an appraisal method when insufficient data exists to perform an accurate valuation under that method." *Regency West*, 372 Wis. 2d 282, ¶26. This is because "an appraiser cannot accurately value a property using data from the sales of properties that are not 'reasonably comparable' to the subject property." *Id.*, ¶60. Accordingly, if there are no recent arm's-length sales of reasonably comparable properties, an appraiser must move on to Tier III. *See id.*; *see also Nestlé USA*, 331 Wis. 2d 256, ¶45.

¶60 Here, MaRous testified that he based his Tier II sales comparison approach on the sale of four properties[14] that he concluded were reasonably comparable to the Lowe's Property:

---

[14] MaRous actually discussed six properties in his comparative sales analysis. Yet, two of those properties were listed for sale and remained unsold as of 2015, and MaRous relied on the asking price for his analysis of "comparative sales."

On appeal, Lowe's asserts that MaRous's consideration of these listings is "as directed" by page 7-23 of the *Assessment Manual*. The *Assessment Manual* says no such thing. At page 7-23, it says that an assessor "should be *aware* of asking prices, listing prices, and typical market exposure time for the area as these may indicate trends in the market." *Assessment Manual* at 7-23 (emphasis added). It does not say that listing prices can be substituted for prices from "recent arm's-length sales" and used in a Tier II analysis. *See* WIS. STAT. § 70.32(1). We discuss MaRous's analysis of these listings no further.

**Sale #1** is a former Lowe's store located at 6300 W. Brown Deer Road in Brown Deer. The store was built in 2006 and Lowe's closed it in or around 2011. After it had been vacant for two years, Walmart purchased it in December 2013 for a sale price of $5,150,000 ($36.90 per square foot). The sales price was "adjusted for [the] indebtedness owed by Lowe's to [the] Village of Brown Deer."

**Sale # 2** is a former Sentry Foods grocery store located at 123 W. Oklahoma in Milwaukee. The store was built in 1984 and was sold to another grocery chain in May 2011 for $3,700,000 ($57.27 per square foot).

**Sale # 3** is a former Target located at 7450 Green Bay Road in Kenosha. The store was built in 1994, and later closed. The property was sold in a deed-restricted sale in November of 2012 for $2,385,000 ($24.81 per square foot) and then divided into two units, Gordmans and Bed, Bath & Beyond.

**Sale # 4** is a former Home Depot located at 2020 N. Spring Street in Beaver Dam. Home Depot opened the store in 2006 and vacated it in 2008. The property was sold in November of 2013 for $2,500,000 ($24.39 per square foot) and converted to manufacturing use. According to MaRous's report, "the least amount of weight was given to this sale due to its inferior location."

As MaRous acknowledged, all four of these properties were vacant at the time of the sale.[15]

¶61    In his report, MaRous acknowledged that the number of sales that could be considered comparable was "limited," and further, that some of these properties differed significantly from the Lowe's Property in location, size, and age. Even so, his report asserted that these four properties were "the most

_____

[15] When testifying, MaRous equivocated about whether Sale #2, the Sentry Foods, was vacant, and the circuit court did not make any specific findings about whether it was. Nevertheless, on appeal, Lowe's acknowledges that all four properties were "'vacant,' meaning they did not have businesses occupying the properties at the time of sale."

appropriate to this analysis and they do serve to prove a meaningful basis for a market comparison analysis." To account for differences between these properties and the Lowe's Property, MaRous made multiple adjustments, each one ranging from negative 30% to positive 45% of the sale price, based on professional judgment.

¶62 Miller, by contrast, testified that he considered the sales MaRous identified and concluded that none were reasonably comparable. Among other things, all had been vacant for years before they were sold. None had been sold for use as the highest and best use as a big box home improvement store, and all but Sale #1 were sold for a purpose other than big box use. Miller also discussed deed restrictions on some of the properties and noted that as an additional reason he did not consider them comparable. Miller went through MaRous's comparative sales one by one and explained his specific reasons for concluding that the sales were not comparable and, therefore, not appropriate for a Tier II analysis.[16]

¶63 Miller further testified about the steps he took to determine whether there were any other sales that he could use to conduct a Tier II analysis. After determining that the sales MaRous identified were not reasonably comparable, he looked for other potentially comparable sales of a "big box retail store in general

---

[16] For example, Miller testified that Sale #1 was an underperforming store, and Lowe's sold it to Walmart in a complex tripartite agreement between Lowe's, the City of Brown Deer, and Walmart. As part of the agreement, Walmart stipulated to an $11,000,000 tax assessment. As we understand Miller's testimony, he concluded that Sale #1 did not truly represent an arm's-length transaction. As for Sale #2, the grocery was a significantly smaller and older property that needed extensive work, and "grocery" was not the highest and best use of the Lowe's Property. As for Sale #3, Target placed significant deed restrictions on the sale to limit certain retailers. As for Sale #4, this Home Depot in Beaver Dam closed within two years of opening, shortly after Menards opened a competing retail location. As we understand it, Miller inferred that Home Depot closed its Beaver Dam store after concluding that the small community was unable to support multiple big box home improvement stores.

in excess of 100,000 square feet throughout the state," as well as national sales to inform him of whether there were any sales that could be adjusted to account for differences in location.[17] Miller acknowledged that there were scattered examples of big box home improvement stores that had been closed and were marketed for other uses, but those stores had been closed for a reason—the market did not support a big box home improvement store in those locations. Miller testified that, based on highest and best use, he did not find any state or national sales that were similar in both physical and economic characteristics, "including similarities in the ability to generate income and/or similar income streams." Therefore, he opined that there was not sufficient reliable market data to perform a reliable Tier II analysis.

¶64     After considering the evidence, the circuit court agreed with Miller and found that the sales identified by MaRous were not reasonably comparable properties. The court provided multiple reasons for rejecting MaRous's comparable sales analysis. Among other things, MaRous had selected dark and vacant properties that were not reasonably comparable to the Lowe's Property. *See* **Bonstores**, 351 Wis. 2d 439, ¶¶22-23. The properties were sold to be converted to a use that was not reasonably comparable to the highest and best use of the Lowe's Property. *See* **Nestlé USA**, 331 Wis. 2d 256, ¶32. Additionally, some were deed-restricted sales, even though the Lowe's Property has no such restrictions. *See* **Regency West**, 372 Wis. 2d 282, ¶34. For these and other

---

[17] Lowe's criticizes Miller for limiting his search to properties greater than 100,000 square feet, which "excluded many potential comparable big box properties." Yet, Lowe's does not explain how its critique of Miller's search parameters could influence the outcome of this appeal. Lowe's bears the burden to overcome the presumption of correctness, and its expert, who used broader parameters, did not identify any properties that the circuit court found to be reasonably comparable.

reasons, the court discredited MaRous's appraisal and found that it was not possible to perform a reliable Tier II analysis.

¶65     As we have explained, the decision to credit expert testimony is uniquely within the province of the fact finder. *See, e.g.*, **Adams Outdoor Advert.**, 294 Wis. 2d 441, ¶27. As shown above, there is ample evidence to support the circuit court's findings of fact and credibility determinations regarding the experts' Tier II analyses. MaRous selected sales that the court determined were not reasonably comparable, and he then applied multiple adjustments in an attempt to force the comparison rather than moving on to a Tier III valuation approach.[18] The court did not err when it rejected this analysis as contrary to Wisconsin law. *See* **Regency West**, 372 Wis. 2d 282, ¶60 ("[A]n appraiser cannot accurately value a property using data from the sales of properties that are not 'reasonably comparable' to the subject property. Absent comparable sales, an appraiser must apply the third tier for valuing property.").

¶66     The primary argument to the contrary advanced by Lowe's is that it was improper for the circuit court to consider the vacancy status of the properties MaRous identified as comparable. According to Lowe's, the court's determination that the vacant properties are not reasonably comparable stems from an "over-extrapolation and misinterpretation" of our decision in **Bonstores**, 351 Wis. 2d 439, and violates **Walgreen/Oshkosh**, No. 2013AP2818, unpublished slip

---

[18] Lowe's argues that the *Assessment Manual* directs appraisers to make adjustments to account for differences between a subject property and comparable sales. This is true if the property being adjusted is reasonably comparable in the first instance. Neither Wisconsin law nor the *Assessment Manual* support the proposition that an appraiser can use a sale that is not reasonably comparable as a starting point and then adjust it to the point where it is. *See, e.g.*, **Regency West**, 372 Wis. 2d 282, ¶60.

op.  We disagree.  It is Lowe's that misinterprets ***Bonstores*** and over-extrapolates from ***Walgreen/Oshkosh***.

¶67  In ***Bonstores***, the owner of a department store relied on its expert appraiser's analysis of comparable sales to challenge its tax assessment as excessive; however, the purportedly comparable department stores the expert relied on had gone "dark."  ***Bonstores***, 351 Wis. 2d 439, ¶21.  We affirmed the circuit court, which rejected the appraiser's opinion that the sales were reasonably comparable.  As we explained, "the subject property is not a 'dark' store, has never gone dark, and there is no evidence it would go dark and be sold off as a single property."  ***Id.***, ¶22.  As such, it was appropriate for the circuit court to reject the appraiser's comparative sales analysis as unreliable because it was based on properties that were not reasonably comparable.  ***Id.***

¶68  Lowe's asserts that the holding from ***Bonstores*** should be limited to "*distressed* property sales—not merely vacant sales."  But Lowe's barely develops the argument, and it does not even define what it means by "distressed" in its appellate brief.  Lowe's appears to be relying on MaRous's testimony that a "distressed" sale is one where the seller must sell the property in a very short time period because it is unable to make payments on the property as they come due.  The distinction that Lowe's attempts to make is not grounded in the text of the ***Bonstores*** opinion, in which we explained that the circuit court used the phrase "distressed" property to refer to a property that had gone "dark," ***id.***, ¶22, and that

31

the appraiser used "dark" to mean "a period of time where the store is not operating," *id.*, ¶21.[19]

¶69    We need not decide whether it would ever be appropriate to determine that a vacant retail store is reasonably comparable to a retail store that is occupied.  It is enough that *Bonstores* provides ample support for the circuit court's determination that the sales MaRous identified are not reasonably comparable to the Lowe's Property, which undisputedly was not a 'dark' store in 2015, was not at risk of closing, and has never closed.  *Bonstores*, 351 Wis. 2d 439, ¶¶21-22.

¶70    Along similar lines, Lowe's argues that consideration of the occupancy status of the Lowe's Property violates the principle of fee simple valuation discussed in *Walgreen/Oshkosh*, No. 2013AP2818.  This argument likewise fails.  As we have already discussed, the principle that emerged from the *Walgreen* cases is that it is improper to value contract rights as if they are property rights.  *See supra*, ¶52.  The fact that the Lowe's Property was occupied supports the circuit court's conclusion that the Lowe's Property, and particularly its

---

[19] Indeed, subsequent revisions to the *Assessment Manual* have explained that an assessor "should be careful to avoid using comparable sales involving properties that are vacant, in transition or suffering from some form of distress unless the subject property is similarly vacant, in transition, or distressed," and that, "when valuing stabilized, operating retail properties, the assessor should choose comparable sales exhibiting a similar highest and best use and similar placement in the retail marketplace." *Wisconsin Property Assessment Manual* 13-42 (2021) (citing *Bonstores Realty One, LLC v. City of Wauwatosa*, 2013 WI App 131, 351 Wis. 2d 439, 839 N.W.2d 893).

This text was added in December of 2015 and remains in the current version of the *Assessment Manual*.  During the trial, Lowe's strenuously objected to any reliance on this passage from the *Assessment Manual* because it was added after the valuation date for the Lowe's Property.  However, there's no indication in the circuit court's decision that it relied on this language from the *Assessment Manual*.  In any event, *Bonstores* was binding precedent at that time and Lowe's fails to explain how this language misinterprets *Bonstores*.

location and physical attributes, was suitable and marketable for use as a big box home improvement store. These are attributes of the real estate, not of the business concern that occupied it. The court in *Walgreen/Oshkosh* did not hold that appraisers are required to use vacant properties as comparative sales when valuing a property that is occupied, nor did it hold that consideration of occupancy automatically and impermissibly values the "business concern" of the current occupant.

¶71 Finally, Lowe's takes issue with the circuit court's reliance on deed restrictions in determining that two of the sales MaRous identified were not reasonably comparable. It contends that there was "uncontroverted" testimony by Richard Keller, the property manager for Lowe's, that deed restrictions are ubiquitous in retail real estate transactions and have limited impact in negotiations. This argument fails for two reasons. First, the circuit court found that Keller did not have personal involvement with the sales in question. Second, assuming without deciding that this argument has merit, it would not change the outcome of this case. Even if the court had credited Keller's testimony, it gave other reasons for determining that these properties were not reasonably comparable, the most prominent being that the highest and best uses of these properties were not reasonably comparable to the Lowe's Property.

¶72 For all these reasons, we conclude that the circuit court did not err when it determined that MaRous's comparable sales analysis did not constitute significant contrary evidence that the 2015 tax assessment was excessive.

### D. Tier III Cost Approach

¶73 We now turn to the circuit court's discussion of the cost approach analyses conducted by MaRous and Miller. The cost approach is also premised on

the concept of substitution—"that a well-informed buyer will pay no more for a property than the cost of constructing an equally desirable substitute property with like utility." *Assessment Manual* at 7-31. When using the cost approach method, an appraiser considers how much it would cost to acquire the land and build the improvements and then deducts for various categories of depreciation and obsolescence. *Id.* at 7-23, 7-31.

¶74 According to MaRous, he performed a cost approach as a "check" on the reliability of his Tier II analysis. Using a cost approach method, MaRous valued the Lowe's Property at $7,300,000.[20] The court concluded that MaRous's cost approach analysis was not credible and did not constitute "significant contrary evidence that the City's assessment of the Property was excessive."

¶75 In its appellate brief, Lowe's argues that the cost approach is not a reliable means of determining the market value of the Lowe's Property. At trial, MaRous testified that "market participants don't even look at cost," and that "market buyers of big box owner-occupied, retail buildings do not rely on the cost approach." We could rely on these statements as a concession that MaRous's cost approach analysis fails to provide significant contrary evidence to overcome the presumption of correctness.

¶76 Nevertheless, we briefly address the circuit court's findings regarding "functional obsolescence" and the objections Lowe's makes to those findings. "Functional obsolescence is the loss in value due to a lack of or

---

[20] Miller, by contrast, valued the Lowe's property at $17,330,000 using the cost approach.

excessive utility" that "occurs over time because of changing needs, technology, design, promotion/marketing, and cost/construction." *Assessment Manual* at 7-33.

¶77     MaRous estimated that it would cost $62 per square foot to build an equivalent retail store.  He then deducted, among other things, 40% for functional obsolescence.  MaRous explained that the 40% deduction was necessary because the store's "large building size and deep retail footprint … appeals to a relatively narrow segment of the market," and because significant costs would be incurred for "re-purposing [the] large big box retail store for multi-tenant uses."  In other words, MaRous calculated the cost to build a new big box home improvement store, and then deducted 40% of that value based on a hypothetical and costly conversion to multi-tenant use.

¶78     The circuit court found that "MaRous failed to calculate functional obsolescence based on the Manual and Wisconsin law."[21]  As the court explained, MaRous's functional obsolescence calculation was made "based on pure speculation" and values what the Lowe's Property would be worth if it were redeveloped as a multi-use property, "thereby devaluing the characteristics of the Property that are specific to its highest, best, and current use."

¶79     The argument Lowe's makes to the contrary is based on arguments that we have already rejected—that the circuit court's determination of highest and

---

[21] In its decision, the circuit court mistakenly stated that MaRous deducted 27% for "external obsolescence."  According to his report, MaRous actually deducted 10% for external obsolescence (to account for the fact that he considered Burleigh Square an inferior location to Wauwatosa's "much more dynamic Mayfair Road corridor") and an additional 17% for physical depreciation (to account for the age of the building), for a total of 27% for these two categories. Lowe's points to the court's error, but does not explain how it is material to our review.  It was MaRous's deduction for functional obsolescence, not his deduction for the two other categories, that led the court to discredit MaRous's analysis.

best use was erroneous and that the court valued the property at an above-market value because it is suitable for ongoing use by Lowe's. Lowe's does not persuade us that the court's findings and credibility determinations are clearly erroneous or that MaRous's cost approach helped it overcome the presumption of correctness.[22]

## E. Tier III Income Approach

¶80 When using the income approach, an appraiser estimates the income-generating potential over the life of the property and reduces it to present value. *Assessment Manual* at 9-15. The income approach is "a calculation of present value based on anticipated future benefits," typically, the "rent and other income that the property may produce." *Id.* at 7-23. MaRous and Miller each conducted a Tier III income approach.

¶81 MaRous testified that, similar to his cost approach analysis, he analyzed income as a "check" on the accuracy of his Tier II analysis. MaRous's analysis resulted in a value of $5,870,000—substantially less than the value he obtained under a Tier II comparable sales approach.[23] The circuit court found that,

---

[22] The circuit court gave additional reasons for discrediting MaRous's cost approach. It found, for example, that MaRous estimated the value of the land based on sales of land that was not comparable because it could not be used for retail. Lowe's does not challenge the court's finding on appeal.

The circuit court also found that MaRous failed to "fully account" for the costs of site improvements. In his appraisal, MaRous added $700,000 for the "depreciated value of site improvements," but did not explain how he calculated that number or what it included. Lowe's disagrees with the court's finding, but it does not present any developed argument that challenges it on appeal, and we address it no further. *See **State v. Pettit***, 171 Wis. 2d 627, 646-47, 492 N.W.2d 633 (Ct. App. 1992) (arguments that are unsupported or undeveloped need not be considered).

[23] Miller, by contrast, valued the Lowe's Property at $18,100,000 using the income approach.

similar to his Tier II comparative sales approach, MaRous's income approach "estimated the potential net income based on dark, vacant, and deed restricted properties in locations with different economics from Wauwatosa." The court further found that MaRous applied "adjustments for vacancy that do not reflect the stable and occupied status of the Lowe's Property." Finally, the court found that "MaRous overlooked the overall capitalization rate data for properties most similar to the Lowe's property in favor of a capitalization rate that treats the Property as destabilized." For these reasons and others, the court did not credit MaRous's income analysis.

¶82 The circuit court's findings are supported by the evidence. In his report, MaRous identified ten rental properties that he determined were comparable, and he extrapolated what the market rent for the Lowe's Property would be based on the rents asked for or received by those ten properties.[24] Yet, the five Wisconsin properties he identified were unoccupied with no rents in place, and all were located in significantly inferior locations than the Lowe's Property. The remaining five properties were in Illinois and had been converted to a use other than big box retail. Notably, in his search for comparable rentals, MaRous overlooked six comparable properties in the Wauwatosa area that were occupied with rent in place at more than double the asking rate of the vacant properties MaRous used in his calculations.

---

[24] MaRous then applied an adjustment for vacancy of 15% based on "appraiser judgment," even though the vacancy rate in Milwaukee was less than 9%. The court discredited this adjustment because there was no indication that the subject property was likely to become vacant. For this reason and others, the court rejected MaRous's analysis under the income approach.

¶83 Lowe's disagrees with the circuit court's findings of fact, but it does not demonstrate that these findings are clearly erroneous with any citations to the record. It instead rehashes arguments that we have rejected above—that valuing the Lowe's Property in its current state impermissibly values its business concern, and that the Lowe's Property should be appraised as if it were vacant, in transition, or distressed. We conclude that the court did not err when it determined that MaRous's income approach did not constitute "significant contrary evidence that the City's assessment of the Property was excessive."[25]

## CONCLUSION

¶84 For all of the above reasons, we conclude that the circuit court did not err when it determined that Lowe's failed to overcome the presumption of correctness. Accordingly, we affirm the order that rejected its challenge and upheld the assessment.

*By the Court.*—Order affirmed.

Not recommended for publication in the official reports.

---

[25] Lowe's appears to argue that the circuit court relied too heavily on Dr. Hamilton, who the City presented as an expert on assessment practices and valuation techniques. Lowe's argues that the court "went so far as to embrace Dr. Hamilton as a source of legal authority … and supplant actual Wisconsin law with entirely unfounded and contradictory appraisal concepts." We are not persuaded for at least two reasons. First, this argument is conclusory, and it fails to identify any portion of Dr. Hamilton's testimony that contradicts the legal principles set forth above. *See Pettit*, 171 Wis. 2d at 646-47. Second, Lowe's has failed to show that the court relied in any way on Dr. Hamilton's "appraisal concepts" in rejecting MaRous's Tier II and Tier III analyses; it is apparent that the court's credibility determination rested on MaRous's selection of sale and rental properties that are not comparable and his treatment of obsolescence, among other things.

To the extent that Lowe's attempts to make any other arguments on appeal, we reject them as undeveloped. *See Pettit*, 171 Wis. 2d at 646-47.