COURT OF APPEALS
DECISION
DATED AND FILED

June 10, 2026

Samuel A. Christensen
Clerk of Court of Appeals

**NOTICE**

This opinion is subject to further editing. If published, the official version will appear in the bound volume of the Official Reports.

A party may file with the Supreme Court a petition to review an adverse decision by the Court of Appeals. *See* WIS. STAT. § 808.10 and RULE 809.62.

**Appeal No. 2025AP256**

Cir. Ct. No. 2020CV66

**STATE OF WISCONSIN**

**IN COURT OF APPEALS
DISTRICT II**

WAL-MART REAL ESTATE BUSINESS TRUST,

PLAINTIFF-APPELLANT,

V.

CITY OF BERLIN,

DEFENDANT-RESPONDENT.

APPEAL from an order of the circuit court for Green Lake County: MARK T. SLATE, Judge. *Affirmed*.

Before Gundrum, Grogan, and Lazar, JJ.

**Per curiam opinions may not be cited in any court of this state as precedent or authority, except for the limited purposes specified in WIS. STAT. RULE 809.23(3).**

¶1 PER CURIAM. Wal-Mart Real Estate Business Trust ("Wal-Mart") appeals an order dismissing its complaints that alleged the City of

Berlin's ("City") 2020, 2021, and 2022 property tax assessments were excessive and violated the Uniformity Clause of the Wisconsin Constitution. On appeal, Wal-Mart argues the circuit court erred by determining Wal-Mart failed to prove its assessments were excessive and by failing to address Wal-Mart's uniformity claims. We affirm.

## BACKGROUND

¶2 Wal-Mart owns and operates a retail store with grocery in the City. As relevant to this appeal, Wal-Mart's complaints against the City alleged its property's 2020, 2021, and 2022 property tax assessments were excessive and exceeded the property's fair market value. *See* WIS. STAT. § 74.37(3)(d) (2023-24).[1] Wal-Mart also alleged the City's assessments violated the Uniformity Clause of the Wisconsin Constitution because they were not uniform with the assessments of other properties in the City. *See* WIS. CONST. art. VIII, § 1. The three cases (one for each tax year) were consolidated, and the consolidated case proceeded to a court trial.

¶3 At trial, Wal-Mart stipulated that the City's assessments were entitled to the presumption of correctness. *See* WIS. STAT. § 70.49(2). The assessments of Wal-Mart's property for each tax year at issue were $7,260,000.

¶4 Wal-Mart then called the City's contracted assessor, Zackery Zacharias, adversely. Zacharias explained that, for the three tax years at issue, the City had contracted with his company, Action Appraisers, to "maintain the assessment roll[.]" This meant the assessor would update property record cards to

---

[1] All references to the Wisconsin Statutes are to the 2023-24 version.

reflect changes in the property, such as permits or fire damage, and review sales. The City never contracted with Action Appraisers to perform a revaluation, which would have entailed performing a valuation of every property in the City's taxation district. The City's last revaluation occurred in 2010, and it was performed by a different contract assessor, who was unaffiliated with Zacharias's company.

¶5  Zacharias testified that for the 2020 and 2021 tax years, his father, who had since passed away, signed the City's assessment roll. Zacharias signed the assessment roll in 2022.

¶6  Based off the property record card, in 2013, Wal-Mart's property was assessed at $7,511,400. Zacharias testified it appeared from records that "the cost approach may have been used" to calculate this initial assessment. However, Zacharias was unsure because, at that time, the City had a different contract assessor. Zacharias testified his company used a computer-assisted mass appraisal program called MarketDrive to maintain the City's property record cards electronically and to set assessments. MarketDrive used formulas and models that were constructed during the City's 2010 revaluation.

¶7  Wal-Mart's property assessment remained unchanged from 2013 until 2018. In 2019, Wal-Mart objected to its assessment, and following discussions between Wal-Mart and Zacharias's father, the assessment was reduced to its current value of $7,260,000. The assessment then remained unchanged for the 2020, 2021, and 2022 tax years.

¶8  When asked why the assessment was reduced in 2019, Zacharias testified that when Wal-Mart objected to its assessment, it brought an appraisal to his father's attention. When asked how the $7,260,000 amount was calculated,

Zacharias believed, based on notes, that his father "mimick[ed] what was done … in [Wal-Mart's] appraisal[,]" and "went and looked at other big box stores and did the same thing that [Wal-Mart's] appraiser did by calculating the price per assessment."

¶9     The MarketDrive printout for Wal-Mart's property indicated the $7,260,000 amount was mathematically calculated by reducing the property's improvement value by 4%, which was listed as a "Market adjustment." Zacharias conceded that the MarketDrive model for Wal-Mart's property did not account for any depreciation to the property. However, Zacharias testified that the model used data from 2010, and if he were to revalue the property, he would use 2020 cost data. Zacharias also testified there was not anything from his review of the assessment file that suggested Wal-Mart's property assessments were excessive.

¶10     Wal-Mart presented appraiser Matthew Gehrke, MAI, as an expert witness. Gehrke opined that the value of Wal-Mart's property for each tax year was $3,050,000, $3,620,000, and $3,920,000, respectively. Gehrke valued the property using a tier-2 sales comparison approach. In this approach, Gehrke selected recent sales of properties that he believed were comparable to Wal-Mart's property. He made adjustments to these sale prices to account for his perceived differences between each property and Wal-Mart's property. He then used the adjusted sale prices to estimate a value for Wal-Mart's property for each tax year at issue.

¶11     For two of the tax years at issue, Gehrke also performed a tier-3 cost approach. In this approach, Gehrke determined the replacement cost of the improvements, estimated and subtracted depreciation, and then determined and

added a value for the land. He used the values he derived under the cost approach to check the values he estimated under the sales comparison approach.

¶12 At the conclusion of Wal-Mart's case-in-chief, the City moved to dismiss Wal-Mart's complaints on the basis that Wal-Mart failed to rebut the presumption of correctness and prove that its assessments were excessive. The City argued that "regardless of what [the assessor testified], there is no evidence from him or anybody else that anything that was done in the assessment resulted in an excessive assessment." The City also offered various reasons as to why Gehrke's valuations did not amount to significant contrary evidence that the assessments were excessive.

¶13 The circuit court denied the City's motion. The court explained that it

> certainly … had questions with regards to what comparables [Gehrke] used. But I believe the fact that Mr. Zacharias didn't know what he was doing and Mr. Gehrke has presented testimony which shows that there may be excessive assessments with that, the Court believes that a reasonable view of the evidence does show the plaintiff may have met the burden of proof on the claims as made in their complaint, and the Court will deny that motion.

¶14 The City then presented the expert testimony of Dominic Landretti, MAI, AI-GRS. Landretti opined the fair market value of Wal-Mart's property for the tax years at issue was $10,900,000, $10,900,000, and $11,500,000, respectively. Similar to Gehrke, Landretti valued the property using a tier-2 sales comparison approach. Also similar to Gehrke, Landretti selected recent sales of properties that he believed were comparable to Wal-Mart's property. Landretti made adjustments to the sale prices of these properties based on his perceived differences and then used the adjusted sale prices to estimate a value for

5

Wal-Mart's property for each tax year at issue. Landretti also checked his values using a tier-3 cost approach, where again, similar to Gehrke, Landretti estimated the replacement cost of the building, estimated and subtracted depreciation, and determined and added in the land value. Landretti also did a tier-3 income approach to value.

¶15 Broadly, in the tier-2 sales comparison approach, a significant difference between Landretti's and Gehrke's sales comparison approaches related to each appraiser's selection of comparable sales. In the tier-3 cost approach, a significant difference between Landretti's and Gehrke's cost approaches was Gehrke's 60% deduction for functional and economic obsolescence.

¶16 In rebuttal, Wal-Mart called Stephen D. Roach, MAI, SRA, AI-GRS, CDEI. Roach offered various criticisms of Landretti's valuations.

¶17 Following post-trial briefs, the circuit court issued a written decision dismissing Wal-Mart's complaints. The court found that Wal-Mart failed to rebut the presumption of correctness and establish that its assessments were excessive. The court first found that "Walmart failed to demonstrate that the City's assessors improperly applied Wisconsin law in maintaining the assessments through mass appraisal, rather than single property appraisal." The court rejected Wal-Mart's argument that its assessments were contrary to Wisconsin assessment law because the City had not done a revaluation since 2010. Although the court had "great concern" with Zacharias's testimony and, on certain topics, found him "ignorant," the court nevertheless found him credible. The court observed that "Zacharias[] specifically testified that, while he agreed a revaluation was recommended to the City, nothing from his review of the assessment file suggested that not doing the revaluation led to this specific assessment being excessive."

¶18    The circuit court also found that Wal-Mart failed to prove its property's assessments were excessive.  The court made significant credibility determinations concluding that Gehrke was not credible, his testimony was "evasive and contradictory[,]" and Gehrke was a quintessential "hired gun" who was "willing to tailor his 'expert testimony' to the highest bidder[,]" which in this case was Wal-Mart.

¶19    As for Gehrke's valuations, the circuit court had concerns with both Gehrke's sales comparison approach and his cost approach.  Broadly, in Gehrke's sales comparison approach, the court observed that Wal-Mart's property was a stabilized, operating retail store.  However, Gehrke's selected comparables were largely vacant properties.  This was problematic to the court because Gehrke then compared the sale prices of these vacant properties to a hypothetical sale of an operating retail property without making any adjustment for the vacancy status.

¶20    The circuit court was also concerned that Gehrke, when making his selection of which sales to use to compare to Wal-Mart's property, "simply ignored leased fee sales" of "other discount stores with grocery" because Gehrke "said that the subject property [wa]s not leased."  However, the court observed that Gehrke could point to nothing in Wisconsin assessment law that categorially excluded the use of leased-fee sales in a sales comparison approach.  Rather, the court observed that Gehrke later admitted, leased-fee sales could be used if an appraiser confirmed the details of the lease.

¶21    To further establish the circuit court's concerns with Gehrke's selected comparables, the court then devoted five pages in its written decision to detail its specific concern with *each* comparable sale Gehrke used in his sales comparison approach.  Some of the court's criticisms were that the sales did not

meet the criteria of a market-value sale (for example, one property sold at auction, other properties were part of a real estate investment trust transaction, two properties were not exposed to the market for long enough, one property Gehrke admitted was "dark" and should not have been used but yet was used in two valuation years, one store was vacant for four years and would be considered "dark[,]" etc.). The court also observed that some of the selected comparables were not comparable to Wal-Mart (for example, the properties were vacant, one property was sold to be transitioned to a manufacturing property, one property was sold for governmental use, one property had a deed restriction forbidding the use of a store like the subject property, etc.).

¶22    After outlining each concern, the circuit court stated its "biggest concern" was that Gehrke made no adjustments in the sale prices of these comparables to account for the differences highlighted by the court. Gehrke simply compared these sales to a hypothetical sale of Wal-Mart's property. The court concluded:

> Since Walmart is the plaintiff, they have the burden to show by significant contrary evidence that the assessments were excessive. They have shown little evidence that the assessments were excessive. Because of this they have failed their burden.

¶23    As for Gehrke's cost approach, the circuit court stated that because of the tier-2 sales comparison analysis, it did not need to discuss Gehrke's cost approach; however, "it w[ould] do so for the purpose of addressing his unsupported testimony." At trial, Gehrke testified his "cost approach [wa]s developed … as a test of reasonableness to the sales comparison approach[.]" For tax year 2021, Gehrke's cost approach value was $3,680,000 (compared to his sales comparison approach value of $3,620,000), and for tax year 2022, Gehrke's

cost approach value was $4,150,000 (compared to his sales comparison approach value of $3,920,000).

¶24    To reach his cost approach value, Gehrke made a 60% deduction in the property's improvement value for functional and external obsolescence.  In the circuit court's written decision, when discussing this significant deduction, the court pointed to its trial exchange with Gehrke where Gehrke told the court that if a brand-new property was built for $10 million and there was no physical depreciation (because the property was new), Gehrke would nevertheless deduct 60% for functional and external obsolescence and opine the brand-new property could only be sold for $4 million.[2]  The court found that Gehrke did not have an adequate explanation for this deduction.

---

[2]    THE COURT: Just so I am clear, so if Target builds a store across the road from there for $10 million, you believe the assessment should be … 4 million because there is no depreciation for the building costs because it is the first year they open their doors, but you are going to take a 60 percent cutoff right off the top?

[Gehrke]: If there was -- if there was -- if I determined that there was not sufficient, you know, demand for that, then that would be what I am saying.

THE COURT: Okay.  But that's your professional conclusion is that there is a 60 percent decrease in Berlin right now because that's what you did to the current store?

[Gehrke]: Right.

THE COURT: So if Target opens up a store, it costs $10 million to build, the assessment should be 4 million?

[Gehrke]: Yes.

THE COURT: Okay.

(continued)

¶25    The circuit court's decision also considered the remaining witnesses, Landretti and Roach. As for Landretti, the court believed Landretti did not do as thorough an investigation as Gehrke, but the court did not believe Landretti "tailor[ed] his testimony to either party. … [and] [t]he [c]ourt found his testimony credible and consistent with Wisconsin law." The court observed that Landretti used leased-fee sales as comparables in his sales comparison approach and testified he verified the leases for these properties to compare the rent amount to market. The court also found that Landretti's cost approach and income approach "made sense" to the court. The court observed that, in his cost approach, "Landretti did not use the 60% across the board functional and economic obsolescence [deduction] that Mr. Gehrke did."

¶26    As for Roach, the circuit court found that "Roach's testimony was primarily brought forth to impugn the testimony of Mr. Landretti." However, the court gave Roach's testimony minimal weight because "Roach had not been asked to update his reports subsequent to the *Lowe's*[3] decision being released to discuss how the Wisconsin Supreme Court decision impact[ed] his opinions." The court found that "Roach's criticisms of Mr. Landretti's report fail[ed] to cast a shadow over Mr. Landretti's report or his credibility."

¶27    The circuit court then iterated its determination that Wal-Mart failed to establish that its 2020, 2021, and 2022 assessments were excessive. The court

---

[Gehrke]: And by assessment, I mean, I am talking about the value, what the real estate could sell for.

THE COURT: Thank you.

[3] *Lowe's Home Centers, LLC v. City of Delavan*, 2023 WI 8, 405 Wis. 2d 616, 985 N.W.2d 69.

dismissed Wal-Mart's complaints. Wal-Mart appeals. Additional facts are included below.

## DISCUSSION

¶28 On appeal, Wal-Mart argues the circuit court erred by dismissing its complaints against the City. It asserts that it rebutted the presumption and introduced significant contrary evidence through Gehrke's testimony that Wal-Mart's assessments exceeded the property's fair market value. Wal-Mart also argues that the court erroneously failed to address its claim that the assessments violated the Uniformity Clause of the Wisconsin Constitution.

## I. Excessive assessment

¶29 We begin with Wal-Mart's assertion that it established at trial that its assessments were excessive. To do so, we first provide some necessary background to Wisconsin assessment law. "Valuation of real estate for tax assessment purposes is governed by WIS. STAT. § 70.32." *Lowe's Home Centers, LLC v. City of Delavan*, 2023 WI 8, ¶27, 405 Wis. 2d 616, 985 N.W.2d 69. A property is supposed to be assessed at "full value" in accordance with the Wisconsin Property Assessment Manual ("WPAM").[4] Sec. 70.32(1). The courts have interpreted "'full value' to mean market value." *Flood v. Board of Rev.*, 153 Wis. 2d 428, 435, 451 N.W.2d 422 (1990).

---

[4] The Wisconsin Property Assessment Manual ("WPAM") is published annually by the Department of Revenue. WIS. STAT. § 73.03(2a). The Department must prepare and publish the WPAM in electronic form and on the Internet. *Id.*

¶30 "[M]arket value is the most probable price which a property should bring in a competitive and open market under all conditions requisite to a fair sale, the buyer and seller each acting prudently and knowledgeably, and assuming the price is not affected by undue stimulus." 1 Wisconsin Property Assessment Manual 9-7 (2020).[5] There are five elements of a "market value" sale:

1. Buyer and seller are typically motivated;

2. Both parties are well informed or well advised, and acting in what they consider their own best interests;

3. A reasonable time is allowed for exposure in the open market;

4. Payment is made in terms of cash in U.S. dollars or in terms of financial arrangements comparable thereto; and

5. The price represents the normal consideration for the property sold unaffected by special or creative financing or sales concessions granted by anyone associated with the sale[.]

*Id.*

¶31 In setting a property's assessment, an assessor can use mass appraisal or single property appraisal. *Metropolitan Assocs. v. City of Milwaukee*, 2018 WI 4, ¶28, 379 Wis. 2d 141, 905 N.W.2d 784. "Mass appraisal is the systematic appraisal of groups of properties, as of a given date, using standardized procedures and statistical testing." *Id.*, ¶29 (citation omitted). "Mass appraisal stands in contrast to single property appraisal, which is the valuation of a single particular property as of a given date." *Id.*, ¶30.

---

[5] Consistent with the parties, all citations to the WPAM will be to the 2020 version unless otherwise indicated. That version is available at https://www.revenue.wi.gov/documents/wpam20.pdf (last visited 6/3/2026).

¶32    The supreme court has "interpreted WIS. STAT. § 70.32(1) to set forth a hierarchical valuation methodology for single-property appraisal." *Metropolitan*, 379, Wis. 2d 141, ¶31 (internal footnote omitted). The best information of a property's fair market value, tier-1 evidence, is a market-value sale of the subject property. *Id.*, ¶32.

¶33    If there is no recent sale of the subject property, the next best evidence of a property's value, tier-2 evidence, is recent, market-value sales of reasonably comparable properties. *Id.*, ¶33. This valuation method is known as the sales comparison approach. *Id.* "When both tier 1 and tier 2 are unavailable, an assessor then moves to tier 3." *Id.*, ¶34. "Under tier 3, an assessor 'may consider all the factors collectively which have a bearing on value of the property in order to determine its fair market value.'" *Id.* (citation omitted). The cost approach and the income approach are both tier-3 valuation approaches.

¶34    When the assessor places a property's assessment on the yearly assessment roll and certifies that the property valuation has "been made with the best information available that can practicably be obtained using professionally accepted appraisal practices,"[6] a presumption of correctness attaches to the assessor's assessment. WIS. STAT. § 70.49(2); *see also Lowe's*, 405 Wis. 2d 616, ¶35. The assessor's presumption of correctness "may be rebutted if the assessor did not correctly apply the [WPAM] and Wisconsin statutes or if a challenger presents significant contrary evidence." *Lowe's*, 405 Wis. 2d 616, ¶32.

---

[6] The assessor's affidavit must be on a form prescribed by the department of revenue. WIS. STAT. § 70.49(1). This quoted language reflects the language in the department of revenue's form for the tax years at issue in this case.

¶35     On appeal, Wal-Mart first argues that it rebutted the presumption of correctness afforded to the City's assessments because the City assessor did not set the disputed assessment according to Wisconsin assessment law.  Wal-Mart argues that the Record reflects the assessor did not know how the assessments were set, the assessor did not properly rely on the three-tiered assessment methodology to set the assessments, the assessed values did not account for depreciation, and the assessments went unchanged for years.  Wal-Mart also emphasizes the circuit court's determination that it had "great concern about the City's assessor[.]"

¶36     For purposes of this case, we assume without deciding that Wal-Mart established the City did not set the disputed assessments in conformance with Wisconsin assessment law.  As such, we need not address Wal-Mart's arguments relating to how often taxation districts must conduct revaluations and its other concerns with Zacharias's testimony.  *See State v. Blalock*, 150 Wis. 2d 688, 703, 442 N.W.2d 514 (Ct. App. 1989) (cases decided on narrowest possible ground).  However, this assumption does not, by itself, establish that Wal-Mart's assessments were excessive and that Wal-Mart is entitled to a partial refund of property taxes previously paid.  *See* WIS. STAT. § 74.37(1).

¶37     In an excessive assessment action, Wal-Mart bears the burden of proving that the disputed assessments exceeded the property's fair market value.  *See Lowe's*, 405 Wis. 2d 616, ¶37 ("If, in the context of a WIS. STAT. § 74.37 action, the failure to follow the [WPAM] results in an excessive assessment, then the presumption is overcome[.]"); *Metropolitan*, 379 Wis. 2d 141, ¶40 ("The question on appeal in a … § 74.37 action is not whether the initial assessment was incorrect, but whether it was excessive."); *Clear Channel Outdoor, Inc. v. City of Milwaukee*, 2017 WI App 15, ¶4, 374 Wis. 2d 348, 355, 893 N.W.2d 24 ("The

burden is on [the taxpayer] to prove by clear and satisfactory evidence that the assessments here are in error.").

¶38    We therefore turn to whether Wal-Mart established its 2020, 2021, and 2022 assessments exceeded the property's fair market value.  In our review, "we interpret and apply WIS. STAT. § 70.32 to determine whether the appraisal at issue followed the statutory directives."  *Metropolitan*, 379 Wis. 2d 141, ¶24. "Statutory interpretation and application present questions of law that this court reviews independently of the determinations rendered by the circuit court[.]"  *Id.*

¶39    "We do, however, defer to a circuit court's findings of fact."  *Id.*, ¶25.  "Factual findings made by the circuit court will not be disturbed unless they are clearly erroneous."  *Id.*  "It is within the province of the factfinder to determine the weight and credibility of expert witnesses' opinions."  *Id.*

¶40    At this point, we pause to discuss a tier-2 sales comparison approach.  This valuation method "is 'based on the premise that similar properties will sell for similar prices on the open market.'"  *Lowe's*, 405 Wis. 2d 616, ¶42 (citation omitted).  "The sales approach relies on recent market sales of similar properties to predict the probable market price of the subject."  1 Wisconsin Property Assessment Manual 9-22.  "Comparable sales refer to properties that are similar to the subject property in age, condition, use, type of construction, location, design, physical features and *economic characteristics*."  *Lowe's*, 405 Wis. 2d 616, ¶43 (emphasis added; citation omitted).  "The more similar the sold property is to the subject, the more reliable is the sale price as an indicator of the value of the subject property."  *Id.* (citation omitted).  "Where sales differ from the subject, [the sale prices] are adjusted up or down in an attempt to reflect how the market responds to the various differences."  1 Wisconsin Property Assessment

15

Manual 9-22. "The amount of adjustment must be reflected in sales data and not just a 'guess' on the part of the assessor." *Id.*

¶41 Further,

> [t]he assessor should avoid using sales of improved properties that are vacant ("dark") or distressed as comparable sales unless the subject property is similarly dark or distressed. A vacant store is considered dark when it is vacant beyond the normal time period for that commercial real estate marketplace and can vary from one municipality to another. A recent court case stated distressed properties are not seen as meaningfully comparable to operating properties.

*Lowe's*, 405 Wis. 2d 616, ¶44 (citing 1 Wisconsin Property Assessment Manual 9-12 (2016), *currently* 13-12 (2020)); *see also* **Bonstores Realty One, LLC v. City of Wauwatosa**, 2013 WI App 131, ¶¶21-22, 34-35, 351 Wis. 2d 439, 839 N.W.2d 893.

¶42 On appeal, Wal-Mart argues "the circuit court erred by rejecting all of Walmart's comparable sales[.]" It first asserts that "[n]one of [the] comparable sales [selected by Gehrke] were 'dark' or distressed[.]" In its decision, the court found that two of Gehrke's sales were "dark" sales. The first one, a sale of a former JCPenney, was used in two of Gehrke's valuations. At trial, Gehrke explicitly testified that this sale "was a dark sale" and should not have been used.[7]

---

[7] The following exchange occurred at trial:

> [The City's Counsel]: And so is it your opinion that after the *Lowe's* decision you should no longer have included that JCPenney, former JCPenney sale as part of the 2020 and 2021 reports?

(continued)

Given Gehrke's admission, the court did not err by characterizing this sale as "dark." *See Metropolitan*, 379 Wis. 2d 141, ¶24.

¶43 The second sale was a sale of a former Shopko. Gehrke also used this sale as a comparable in his valuation for two tax years. At trial, when discussing "dark" stores, Gehrke testified "a dark store is three years from the time that the tenant vacates it[.]" *See Lowe's*, 405 Wis. 2d 616, ¶46 ("[A] vacant store is considered dark when it is vacant beyond the normal time period for that commercial real estate marketplace and can vary from one municipality to another." (citation omitted)). Gehrke, however, testified that this former Shopko property sat vacant for almost four years from the time that Shopko left until the sale. Given Gehrke's testimony, we cannot conclude the circuit court's determination that this property "was vacant for almost 4 years, moving it into a dark store sale" was clearly erroneous. *See Metropolitan*, 379 Wis. 2d 141, ¶24.

¶44 Wal-Mart next argues the circuit court's concern that Gehrke used sales of vacant stores to compare to Wal-Mart's operating retail store was erroneous. Wal-Mart argues that by being concerned about vacancy/occupancy, the court impermissibly considered business value as opposed to market value.

¶45 However, Wal-Mart's argument has already been explicitly rejected by the supreme court in *Lowe's*. There, the court stated:

> [Gehrke]: Because it would be considered a dark sale. Everything else that was stated previously with regard to physical condition, that is still -- would be correct and I still believe that. But it would be a dark sale because of its length of vacancy. And given the ruling, it would be disqualified as being an improved sale because of that later date ruling.

> Lowe's' argument misses the mark when it advances that accounting for the vacant nature of a store necessarily values the business concern and not just the fee simple interest in the land. Many factors inform the value of land, including the land's viability to house a business. Saying that land is suitable for a successful business, or that the land has a track record of housing a successful business, and assigning a value to that fact is not the same as valuing the business itself. Generally, a site that can sustain a business is more valuable than one that cannot.

*Lowe's*, 405 Wis. 2d 616, ¶53. Wal-Mart does not explain *why* it was incorrect for the circuit court to be concerned that Gehrke generally selected vacant properties to compare to an operating retail store. Further, given our supreme court's reasoning in *Lowe's*, we disagree with Wal-Mart that the court's concern about vacancy was inappropriate. *See id.*

¶46 Wal-Mart also argues the circuit court erred by suggesting that Gehrke should have made adjustments to account for vacancy. It states in conclusory fashion that "there is no such adjustment available in professionally accepted appraisal practice." Wal-Mart cites no assessment law or trial testimony in support of its assertion. Moreover, in a sales comparison approach, "[e]conomic characteristics" is one of the elements of comparison that the assessor should consider when making adjustments. 1 Wisconsin Property Assessment Manual 9-26; *see also Lowe's*, 405 Wis. 2d 616, ¶53. The *Lowe's* court also rejected "the blanket proposition that occupancy or vacancy has no role to play in valuation[,]" and it noted "[g]enerally, a site that can sustain a business is more valuable than one that cannot." *Lowe's*, 405 Wis. 2d 616, ¶¶52-53.

¶47 Wal-Mart next argues "[t]he circuit court also erred by requiring an overly narrow highest and best use for comparable sales." Presumably, this is a critique of the court's concern that Gehrke selected properties to use as comparable sales that were transitioning from retail use to other uses, such as

governmental, industrial, or manufacturing. However, Wal-Mart overlooks that its property does not currently have these uses and it is not transitioning to these uses. *See Nestlé USA, Inc. v. DOR*, 2011 WI 4, ¶32, 331 Wis. 2d 256, 795 N.W.2d 46 ("[T]he properties an assessor identifies as 'reasonably comparable' to the subject property for assessment purposes must be reasonably comparable to the subject property's highest and best use.").

¶48    Further, in *Lowe's*, 405 Wis. 2d 616, ¶57, the circuit court stated:

> The highest and best use of a store in an area that is conducive to business (and is in fact operating as a business) is different from the highest and best use of a property that contains a failed big-box store. Lowe's' argument treats these different things alike, which is not the 'apples to apples' comparison contemplated in a tier 2 analysis.

Wal-Mart does not explain how the court's concern regarding Gehrke's comparables and their highest and best use is inconsistent or contrary to *Lowe's*.

¶49    Wal-Mart then argues that the circuit court erroneously characterized Gehrke's testimony regarding why he did not consider any leased-fee sales as equivocal. Wal-Mart offers one explanation that Gehrke gave the court—that he did not consider leased-fee sales because he believed the leases would affect the sale price. However, Wal-Mart overlooks that Gehrke initially testified that he did not consider any leased-fee sales because the subject was owner-occupied and had no lease. We cannot conclude the circuit court's determination that Gehrke's testimony was equivocal was clearly erroneous. *See Metropolitan*, 379 Wis. 2d 141, ¶24.

¶50    We also observe that Wal-Mart's appellate brief only addresses a handful of the court's concerns with Gehrke's selection of comparables. We deem

the circuit court's remaining concerns with Gehrke's selected comparables conceded. *See **Charolais Breeding Ranches, Ltd. v. FPC Sec. Corp.***, 90 Wis. 2d 97, 109, 279 N.W.2d 493 (Ct. App. 1979) (unrefuted arguments are deemed admitted). Further, Wal-Mart also does not address the court's significant concern with the 60% deduction Gehrke made in his cost approach, which was used to check the reasonableness of his sales comparison approach. *See **id.***

¶51 In short, we cannot conclude that the circuit court's determinations and critiques of Gehrke's selection of comparable sales were unreasonable, contrary to assessment law, or clearly erroneous. We affirm the circuit court's determination that Wal-Mart failed to prove that its property's 2020, 2021, and 2022 assessments exceeded the property's fair market value.

## II.   Uniformity violation

¶52 Wal-Mart next argues the circuit court erred because it failed to specifically address Wal-Mart's claimed uniformity violation. We agree with Wal-Mart that the circuit court's decision did not explicitly address uniformity. In its post-trial brief, Wal-Mart argued it established a uniformity violation because it believed it had proven that the City's assessments did not comply with Wisconsin assessment law. The court, however, concluded Wal-Mart failed to establish that the City's assessments did not comply with Wisconsin assessment law. Based on the court's decision, it appears the court tacitly denied Wal-Mart's uniformity claim.

¶53 In any event, the Uniformity Clause provides in relevant part: "*The rule of taxation* shall be uniform but the legislature may empower cities, villages or towns to collect and return taxes on real estate located therein by optional methods." WIS. CONST. art. VIII, § 1 (emphasis added). This provision has been

held to "require[] that the method or mode of *taxing* real property must be applied uniformly to all classes of property within the tax district." *State ex rel. Levine v. Board of Rev. of the Vill. of Fox Point*, 191 Wis. 2d 363, 371, 528 N.W.2d 424 (1995) (emphasis added).

¶54 For assessment purposes, "Uniformity occurs when all property is assessed at full value or when all classes of property are assessed at the same percentage of full value." 1 Wisconsin Property Assessment Manual 9-9. Critical for uniformity is "that the tax burden of each dollar's worth of one sort of property is liable for exactly the same tax as a dollar's worth of any other property in that statutory class." *Id.* at 9-10.

¶55 In *Levine*, the court stated:

> Under this principle known as the rule of uniformity, taxpayers may demonstrate that although their properties were assessed at fair market value, other comparable properties were assessed significantly below fair market value, thus amounting to a discriminatory assessment of their property.

*Levine*, 191 Wis. 2d 363, at 371-72 (citation omitted).

¶56 The supreme court has found a constitutional uniformity violation where there is evidence, for example, that "newly constructed properties were assessed at fair market value, [while] comparable older properties were assessed at less than fair market value, resulting in their paying more than their proportionate amount of property tax." *Id.* at 371. In *Levine*, the assessor "openly admitted that he did not rely on sale prices to determine the fair market value of certain older properties. Instead, he discounted the sale prices of the older properties because, in his opinion, the purchasers were overpaying for these properties." *Id.* at 373 (footnote omitted).

¶57 The supreme court has also found a uniformity violation when "the assessor[] singl[ed] out [one commercial property] for reassessment based on its recent sale, while intentionally refusing to reassess other commercial properties that were recently sold[.]" *Noah's Ark Fam. Park v. Board of Rev. of the Vill. of Lake Delton*, 216 Wis. 2d 387, 388-89, 393, 573 N.W.2d 852 (1998).

¶58 Conversely, the "court has rejected challenges alleging violations of the rule of uniformity where the claim was based on comparing one taxpayer's appraised value to the value assigned to an inadequate number of other properties in the assessment district." *Allright Props., Inc. v. City of Milwaukee*, 2009 WI App 46, ¶54, 317 Wis. 2d 228, 767 N.W.2d 567.

> A taxpayer has no complaint when a valuation which could ordinarily be obtained therefor at private sale is placed upon his property, unless there is such a general undervaluation of the other property of the assessment district as will result in an excessive tax as to him. Such a situation is not shown by proof which compares the valuation of a taxpayer's property with less than 2 per cent. of the other property in the assessment district[.]

*Walthers v. Jung*, 175 Wis. 58, 61, 183 N.W. 986 (1921).[8]

¶59 On appeal, Wal-Mart argues it has established a uniformity violation. In support, it argues the City failed to reassess its property for years, did not set the assessment using a tier-2 sales comparison approach, and did not deduct depreciation from its assessment. The sole legal authority Wal-Mart cites in support of its constitutional uniformity violation is a general citation to *State*

---

[8] The two-percent requirement is not a hard rule. Rather, as the supreme court explained in *State ex rel. Levine v. Board of Review of the Village of Fox Point*, 191 Wis. 2d 363, 375-76, 528 N.W.2d 424 (1995), "the two percent figure [was used] simply as a means of underscoring the inadequacy of the evidence presented by the complaining taxpayer in [*Walthers*]."

*ex rel. Markarian v. City of Cudahy*, 45 Wis. 2d 683, 173 N.W.2d 627 (1970). Wal-Mart argues "[u]niformity requires all assessments to be completed using the proper methodology derived from the *Markarian* hierarchy referenced in the Manual and the courts."

¶60    However, *Markarian* is not a uniformity case,[9] does not reference the uniformity clause, and an assessor's failure to follow the *Markarian* hierarchy is not dispositive of whether a uniformity violation exists.   As previously explained, uniformity is concerned with making sure "that the tax burden of each dollar's worth of one sort of property is liable for exactly the same tax as a dollar's worth of any other property in that statutory class."   1 Wisconsin Property Assessment Manual 9-10.  "Uniformity occurs when all property is assessed at full value or when all classes of property are assessed at the same percentage of full value." *Id.* at 9-9.

¶61    Wal-Mart also argues its assessment was not uniform because "[t]he subject property was assessed at $93.01/sf while another big box store across the street was assessed at $57.61/sf."   This fact, however, does not establish a constitutional uniformity violation.  In *State ex rel. Algoma Hous. Co. v. Board of Rev.*, 166 Wis. 2d 675, 682, 480 N.W.2d 786 (Ct. App. 1991), we specifically rejected the taxpayer's argument that it established a uniformity violation by "compar[ing] the assessment per square foot of its property to the value assigned per square foot to two allegedly comparable pieces of property."  We stated that to

---

[9] In *State ex rel. Markarian v. City of Cudahy*, 45 Wis. 2d 683, 687-88, 173 N.W.2d 627 (1970), a landowner alleged his property's assessment exceeded its fair market value.  The supreme court interpreted WIS. STAT. § 70.32(1) to set forth a hierarchical valuation methodology. *Markarian*, 45 Wis. 2d at 686-87.

establish a uniformity violation, the taxpayer must do more than "compar[e] its property to two smaller buildings across the street from its property." *Id.* at 683.

¶62    We conclude that Wal-Mart has not shown that it established at trial the existence of a constitutional uniformity violation; therefore, the circuit court did not err by failing to explicitly address uniformity in its decision.

*By the Court*.—Order affirmed.

This opinion will not be published.    *See* WIS. STAT. RULE 809.23(1)(b)5.